**GRANITE STATE OUTDOOR ADVERTISING, INC.,**
Plaintiff,

v.

**CITY OF CLEARWATER, FLORIDA, et al., Defendants.**

**No. 8:01CV1663T30MSS.**

United States District Court,
M.D. Florida,
Tampa Division.

July 23, 2002.

Kent G. Whittemore, Whittemore, Denson, P.A., St. Petersburg, FL, Sean R. Smith, E. Adam Webb, Dow, Lohnes & Albertson, PLLC, Atlanta, GA, for plaintiff.

Leslie Kathleen Dougall–Sides, Clearwater, FL, William David Brinton, Cristine M. Russell, Rogers, Towers, Bailey, Jones & Gay, Jacksonville, FL, for defendants.

Sean R. Smith, Dow, Lohnes & Albertson, PLLC, Atlanta, GA, for movants.

### *ORDER*

MOODY, District Judge.

This cause came before the Court for consideration upon the following Motions:

1. Individual Defendants' Motion to Dismiss the Complaint with Prejudice (Dkt.# 10) and Motion to Dismiss the Amended Complaint (Dkt.62),[1] Plaintiff's response in opposition thereto (Dkt.# 13) and the individual Defendants' reply thereto (Dkt.22);

2. Plaintiff's Motion for Preliminary Injunction (Dkt.# 16), supporting memo-

---

1. The parties have entered into a stipulation regarding the filing of the Amended Complaint. (Dkt.# 59) wherein they specifically agree that the Amended Complaint "contains no additional legal theories or grounds for relief which would affect the Court's disposition of the parties' pending motions."

randum (Dkt.# 17) and Defendants' memorandum in opposition thereto (Dkt.# 30);

3. Plaintiff's Motion for Partial Summary Judgment (Dkt.# 18), supporting memorandum (Dkt.# 19), and Defendants' memorandum in opposition thereto (Dkt.# 42), and

4. Defendants' Motion for Final Summary Judgment (Dkt.# 41), supporting memorandum (Dkt.# 42) and Plaintiff's response in opposition thereto (Dkt.# 51).

Both parties have also filed supporting affidavits and exhibits to their Motions, including certified copies of the ordinance at issue. The Court heard the arguments of counsel on March 15, 2002. Additionally, the Court requested (Dkt.71), and considered, the parties additional briefs on standing. (Dkts.74, 75).

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiff has filed a separate Statement of Facts in support of its Motions for Partial Summary Judgment and Preliminary Injunction. (*See* Dkt. # 20). Defendants have incorporated their recitation of the facts as part of their memorandum in support of their Motion for Summary Judgment. (*See* Dkt. # 42). The undisputed facts are as follows.

Plaintiff, Granite State Outdoor Advertising, Inc., ("Granite State") is a Georgia corporation in the business of buying or leasing land upon which to construct signs and billboards to be used for the dissemination of both commercial and non-commercial speech. (Amded.Compl., ¶ 6). Defendants point out that Granite State employs only two persons, the president and vice-president, and operates out of the Georgia residence of its president, who previously worked for two outdoor advertising companies. Since its incorporation in 1997, Granite State has "never erected a billboard, never operated a billboard, has never been licensed as an outdoor adver-

tising company, and has not yet held a permit in its own name to erect a billboard." (Charles Dep. at 39–41, 47, 68). To date, Granite State has received profits from the sale of at least twenty-two billboard permits to Eller Media which were obtained from similar litigation brought against various cities and municipalities in the state of Georgia. (*Id.* at 12, 69).

In the case at bar, Granite State entered into lease agreements for five different parcels of real property located in commercial or industrial areas in the city of Clearwater, Florida ("Clearwater"), upon which to construct and operate one freestanding billboard sign on each parcel of property. *Id.*, ¶ 8. Plaintiff subsequently obtained three other lease agreements and filed an amended complaint to add its claims regarding these three parcels. *Id.*, ¶ 8A.

Defendant Clearwater is a political subdivision of the state of Florida and describes itself as a "resort community on the west coast of the state with more than five miles of beaches on the Gulf of Mexico" which has an economic base that relies "heavily on tourism." (*See* § 3–1801). Clearwater has codified various sign regulations to create a comprehensive scheme for regulating, *inter alia*, the permitting, placement, number, construction, size, height, design, operation, and maintenance of the signs within the city's boundaries. (Amded.Compl., ¶ 9). Clearwater has regulated the height and size of signs for more than twenty-five years and enacted various codes over the years. (*See* Dkt. # 42, pp. 6–8).

The sign regulations at issue are contained within Division 18 of Clearwater's Community Development Code (the "Code"). The entirety of the sign ordinance, "Division 18" containing §§ 3–1801 through 3–1807 (the "Ordinance"), is attached as Appendix 1 to this Order and is

referred to herein by section number. Section 3–1802 contains the specific purposes and intentions for which the sign regulations were promulgated. Clearwater's sign regulations are intended to:

A. Enable the identification of places of residence and business.

B. Allow for the communication of information necessary for the conduct of commerce.

C. Lessen hazardous situations, confusion and visual clutter caused by proliferation, improper placement, illumination, animation and excessive height, area and bulk of signs which compete for the attention of pedestrian and vehicular traffic.

D. Enhance the attractiveness and economic well-being of the city as a place to live, vacation and conduct business.

E. Protect the public from the dangers of unsafe signs.

F. Permit signs that are compatible with their surroundings and aid orientation, and preclude placement of signs in a manner that conceals or obstructs adjacent land uses or signs.

G. Encourage signs that are appropriate to the zoning district in which they are located and consistent with the category of use to which they pertain.

H. Curtail the size and number of signs and sign messages to the minimum reasonably necessary to identify a residential or business location and the nature of any such business.

I. Establish a sign size in relationship to the scale of the lot and building on which the sign is to be placed or to which it pertains.

J. Preclude signs from conflicting with the principal permitted use of the site or adjoining sites.

K. Regulate signs in a manner so as to not interfere with, obstruct vision of or distract motorists, bicyclists or pedestrians.

L. Require signs to be constructed, installed and, maintained in a safe and satisfactory manner.

M. Preserve and enhance the natural and scenic characteristics of this waterfront resort community.

The sign ordinance also contains a provision under its "General Standards" section that provides, "[n]ot withstanding any other provision of this Code, no sign shall be subject to any limitation based on the content of the message contained on such sign." § 3–1804.H. Similarly, there is no distinction between commercial or noncommercial speech within the sign ordinance. The sign ordinance regulates four categories of signs: 1) § 3–1803 prohibits twenty-five different types of signs (such as portable signs, vehicle signs and roof signs); 2) § 3–1805 allows twenty different types of signs without a permit (such as safety or warning signs, holiday decorations, garage or yard sale signs and for sale signs); 3) § 3–1806 proscribes certain height, area and lighting requirements for residential signs (subdivision development and multifamily entry signs and school and park identification monument signs) and nonresidential signs (freestanding, monument, transit shelter and attached signs)— these signs require a permit under the development review process; and 4) § 3–1807 permits signs that comply with eight enumerated "flexibility criteria" [2] that may be approved under the City's Comprehensive Sign Program. The sign ordinance also contains a provision, § 3–1804, titled "General Standards," that prescribes

---

**2.** The specific flexibility criteria for signs allowed under the City's Comprehensive Sign Program involve: (1) architectural theme; (2) height; (3) lighting; (4) total area of sign face; (5) community character; (6) property values; (7) elimination of unattractive signage; and (8) special area or scenic corridor plan. § 3–1807.C.

building and electrical code compliance and regulates setback, lighting and illumination, banners and flags, gasoline price signs, and time and temperature signs.

### The Permitting Process

Article 4 of the City's Code, titled "Development Review and Other Procedures," sets forth the process for obtaining various levels of permit approval and the appeals process. Division 10 of Article 4 requires that the application for approval of a sign "shall be reviewed and approved by the community development coordinator as a level one approval."[3] The process for a level one approval is set forth in Division 3 of Article 4, with appropriate references to the appeals process set forth in Division 5— §§ 4–504 and 206 (community development board appeals and public hearings) and § 4–505 (appeals to hearing officer). The relevant divisions of Article 4, §§ 4–206, 301–303, 501–505 and 1001–1007 are attached to this Order as Appendix 2.

The initial step in the permitting process is to complete the application process. Once submitted, a determination of completeness shall be made by the community development coordinator within five days. § 4–202C.1. Within five or ten working days after that determination is made, the community development coordinator or members of the development review committee (depending on whether the level one approval sought is for "standard development" or "flexible standard development") shall determine whether the application is "legally sufficient" (defined as "whether the required application materials have been prepared in a substantively competent manner"). § 4–202C.2 and 3. If insufficient, the application is deemed withdrawn.

Once an application is deemed complete and legally sufficient, the development review committee shall review the application in accordance with the applicable division of the Code; in the case of a sign permit, Article 3, Division 18. § 4–202.D. An appeal may be taken to the Community Development Board which holds a "quasi-judicial public hearing." *See* §§ 4–501, 504, 206. A hearing officer has the authority to hear appeals from the Community Development Board. § 4–501.B.

There are no time limits in the Code for an appeal to be heard.[4] *See* §§ 4–504 and 206 (community development board appeals); § 4–505 (hearing officer appeals of community development board decisions, which are required to establish a "timely date" for the hearing, and must issue a decision within 45 days of the hearing). To overturn a decision, the Community Development Board must find by "substantial competent evidence" that the decision (1) "misconstrued or incorrectly interpreted" the Code, (2) is in "harmony with the general intent and purpose" of the Code and (3) will not be "detrimental to the public health, safety and general welfare." § 4–504.C.

### Severability Provision

Under the Code's "General Provisions," there is a severability provision that reads as follows: "[s]hould any section or provision of this Development Code be declared to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of this Development Code as a whole or any part thereof other than the part so declared to be unconstitutional or invalid." § 1–107.

---

**3.** As further supported by affidavit of Clearwater's community development director. *See* Tarapini Aff., ¶ 7.

**4.** Appeals from abutting property owners are, however, placed on the "next scheduled meeting of the board." § 4–504.B

### Granite State's Applications

Clearwater's ordinance limits freestanding billboard signs in excess of fourteen feet in height and in excess of sixty-four square feet in area per side. § 3–1806.B. Plaintiff applied to Clearwater for permission to post a 65 foot high and 672 square foot billboard sign on each of its leased parcels of property. (Charles[5] Aff. at ¶¶ 6–8). Clearwater's Planning Department denied the applications on August 10, 2001, the same day they were submitted. (Amded. Compl., ¶ 11; Tarapini[6] Aff. at ¶ 9). On each application, Clearwater noted the reason for denial—"Refer to Section 3—1806(B1)" and "Height, Size and Numbers of Signs (Total Square Feet on Parcel)." (Charles Dep., Exh. 1–5). The Plaintiff's proposed signs were more than four times the allowable height and ten times the allowable area. Granite State did not appeal the initial denial of the sign permits and instead, on August 31, 2001, initiated this action by filing an eleven count complaint against Clearwater, its Mayor, Defendant Brian Aungst, Sr., and its City Manager, Defendant William Horne. (Charles Dep. at 92; Tarapini Aff. ¶ 9).

### The Individual Defendants

Defendants Aungst and Horne appear to have been sued in both their individual and official capacities. Neither of these Defendants was personally involved in the denial of Granite State's billboard permit applications and did not learn about the permit applications until after their denial. (*See* Aungst and Horne Affs.). Neither Defendant has had any verbal or written communications with Granite State or its principals, nor have they ever met with representatives of Granite State. (*Id.*).

## II. LEGAL ANALYSIS

### A. Individual Defendants' Motion to Dismiss

The individual Defendants move to dismiss the claims made against them in both their individual and official capacities. In their individual capacities, these Defendants claim that they are entitled to the defense of qualified immunity for any governmental actions taken while they served in their capacities of mayor and city manager. Defendants further maintain that there is no basis for individual liability because Plaintiff has failed to make any allegations whatsoever against the individual Defendants in the Amended Complaint.

Plaintiff opposes the Motion to Dismiss on the basis that these Defendants have enforced "clearly unconstitutional restrictions on the fundamental right of speech," and as such, they should be held liable in their individual capacities. Plaintiff appears to argue, without legal support, that elected or appointed officials[7] can be personally liable for an allegedly unconstitutional ordinance solely by virtue of the fact that the official is responsible for the enforcement of the ordinance.

The Court agrees with Defendants that there is no basis for individual liability in this case because Plaintiff has not alleged any specific allegations against these Defendants; that is, Plaintiff makes no claim against these Defendants for any action taken by these Defendants, supervisory or otherwise, but instead sues them personally for an allegedly unconstitutional ordi-

---

5. Wayne Charles is the president of Granite State.

6. Cyndi Tarapini is Clearwater's Community Development Coordinator and Director of its Planning Department.

7. In the Amended Complaint, Plaintiff identifies these Defendants, respectively, as serving as Clearwater's elected Mayor/Chairman of the City Commission and appointed City Manager. (Amded Compl., ¶¶ 3, 4).

nance. Moreover, the individual Defendants should be dismissed because they are entitled to qualified immunity.

Qualified immunity acts to cloak public officials from lawsuits unless they have violated "clearly established statutory or constitutional law of which a reasonable person would have known." *See Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir.1994). The Eleventh Circuit determines whether a law is clearly established through a fact-specific analysis that focuses on the "actual" and "specific details of [a] concrete case." *Id.* at 1150; *see also Granite State Outdoor Advertising, Inc. v. Cobb County*, Case No. 1:01–CV–1376–WBH at 7–9 (attached as Exh. B to Dkt. 51). The contours of such right must be "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Not only are there no specific factual allegations as to the individual Defendants (who were acting within their discretionary authority), the constitutional law at issue in this case is far from clearly established (as this order will undoubtedly demonstrate). *See Naturist Society, Inc. v. Fillyaw*, 858 F.Supp. 1559, 1571 (S.D.Fla. 1994) (with regard to qualified immunity in First Amendment case, public officials are not expected to be more knowledgeable than the courts with respect to the "complexities of constitutional law"). Accordingly, the individual Defendants are entitled to qualified immunity.[8]

■ Defendants also argue that the Amended Complaint should be dismissed against the individual Defendants in their official capacities because suits against local governments in their official capacities are duplicative of actions against the local government entity itself.[9] The Court agrees. Plaintiff has sued the city of Clearwater for the same alleged constitutional violations. Therefore, naming the individual Defendants in their official capacities is redundant. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Busby v. City of Orlando*, 931 F.2d 764 (11th Cir.1991). Plaintiff's contention that if the Court invalidates the sign ordinance the inclusion of the individual Defendants, in their official capacities, is necessary to insure issuance of the sign permits previously denied to Granite State is meritless.[10] *See Granite State Outdoor Advertising, Inc. v. Cobb County*, Case No. 1:01–CV–1376–WBH at 5–6 (attached as Exh. B to Dkt. 51). The Court may direct Defendant Clearwater, if necessary.

## B. *First Amendment Analysis*

### 1. *Standing*

Typically, standing requires that: 1) a plaintiff suffered an "injury in fact;" 2) that there be a "causal connection" between the injury and the conduct complained of, such that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and 3) it must be "likely,

---

8. The Court makes this finding at the motion to dismiss stage on the allegations of the complaint; and were it to consider the issue at summary judgment after considering the individual Defendants' affidavits and other deposition testimony (submitted in support of its motion for summary judgment) and Plaintiff's response thereto, the Court would make the same finding.

9. Plaintiff concedes that Clearwater is liable for the official conduct of its city officials. *See* Dkt. 13 at 7.

10. Defendants point out that such a cause of action may be necessary when there is a claim against a county or state that is barred by the Eleventh Amendment. This is not such a case.

as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Bischoff v. Osceola County, Fla.*, 222 F.3d 874, 883 (11th Cir.2000). However, for First Amendment overbreadth challenges, the requirements for standing are generally more lenient. *Id.* at 884.

■ The Supreme Court recognized overbreadth challenges as "exceptions" to the general rule of standing for laws that are written "so broadly that they may inhibit the constitutionally protected speech of third parties." *Members of the City Council of Los Angeles v. Taxpayers for St. Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (addressing an ordinance banning handbills on public property). Such a challenge, in essence, permits third party standing for claims on the grounds that ordinance may pose a "realistic danger" that the statute itself will "significantly compromise recognized First Amendment protections of parties not before the court." *Id.* at 801, 104 S.Ct. 2118. Generally, courts have permitted such challenges when the constitutional rights involve the First Amendment.[11] *See, e.g., Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 957–9, 967–8, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Nonetheless, it still remains that a plaintiff must establish that he or she suffered some "injury in fact" as a result of

the defendant's actions. *Bischoff*, 222 F.3d at 884 (*citing Virginia v. Amer. Booksellers Assoc., Inc.*, 484 U.S. 383, 392, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *Munson*, 467 U.S. at 958, 104 S.Ct. 2839; *National Council for Improved Health v. Shalala*, 122 F.3d 878, 883 (10th Cir.1997); *Bordell v. General Electric Co.*, 922 F.2d 1057, 1061 (2nd Cir.1991)).

Defendants contend that Granite State does not have standing to assert the First Amendment claims it makes in this case; nor should it be permitted to make an overbreadth challenge to the Code. Specifically, Defendants make the argument that Granite State cannot contend that the section under which it was denied its permits, § 3–1806.B, which imposes height, size and location limitations on freestanding signs, is unconstitutional. (Dkt. # 42 at 19). To the contrary, Granite State contends that § 3–1806.B is unconstitutional because: 1) it requires applicants to seek permission for development review, a procedure which affords government officials an improper level of discretion without reference to objective standards; 2) it requires applicants to file for permits prior to posting the sign, procedures which are void as impermissible prior restraints on speech; 3) the section restricts commercial and non-commercial signs without satisfying the *Central Hudson*[12] analysis; 4) the section violates equal protection; and 5) it is invalid be-

---

11. The overbreadth doctrine is referred to frequently, yet it remains little understood and a source of much confusion. *See generally,* Hill, Alfred, "The Puzzling First Amendment Overbreadth Doctrine," 25 Hofstra L.Rev. 1063 (Summer 1997); Fallon, Jr., Richard H., "Making Sense of Overbreadth," 100 Yale L.J. 853 (Jan.1991).

12. In *Central Hudson,* the Court struck down as unconstitutional a regulation of the New York Public Service Commission which completely banned promotional advertising by the utility. *Central Hudson Gas & Electric Co. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct.

2343, 65 L.Ed.2d 341 (1980). *Central Hudson* established a four part test for determining the validity of government regulations on commercial speech. *Id.* at 463–64, 100 S.Ct. 2343. The first element deals with the regulation of misleading or unlawful information. *Id.* The other elements of an otherwise valid restriction on protected commercial speech are: (1) it only seeks to implement a substantial government interest; (2) it directly advances that interest; and, (3) it reaches no further than necessary to accomplish the given objective. *Id.; see also Metromedia,* 453 U.S. at 490, 101 S.Ct. 2882.

cause it is inextricably intertwined with the unconstitutional whole of the sign ordinance, preventing severance. (Dkt. # 51 at 3). Defendants also contend that Granite State has not suffered an injury in fact because it did not participate in the appeals process. (Dkt.# 74 at 9–15). Defendants further contend that Granite State does not have standing because it does not have a "commercial speech interest."

■ The Supreme Court has recognized that individuals with a "commercial interest" in speech may raise a facial challenge to an ordinance, raising the non-commercial speech interests of third parties. *Metromedia Inc. v. City of San Diego*, 453 U.S. 490, 504, n. 11, 101 S.Ct. 2882, 69 L.Ed.2d 800. (1981). Although Defendants acknowledge this holding, they claim that Granite State has no speech interest because it has been neither an advertiser nor a billboard operator, instead it merely obtained leases for properties upon which billboards would be constructed. In essence, Defendants argue that these activities are not sufficient to establish an interest in speech sufficient to confer standing.

But Granite State claims that it has a commercial interest in speech. It holds leases on property upon which it has applied for permission to place billboards. In fact, Granite State contends that if victorious in this litigation, it may well choose to build and operate the signs itself. Clearly, parties with a commercial interest in speech may assert facial challenges to the First Amendment, in essence, filing suit on the grounds that there is an infringement of the rights of third parties as well as of their own free speech rights. *See, e.g., Metromedia*, 453 U.S. at 504, n. 11, 101 S.Ct. 2882 ("we have never held that one with a 'commercial interest'

in speech also cannot challenge the facial validity of a statute on the grounds of its substantial infringement of the First Amendment rights of others"); *but see id.* at 544–48, 101 S.Ct. 2882 (Steven, J., dissenting) (no standing, even under the "limited exception" for overbreadth, for "hypothetical cases" of property owners not before the Court). *See also National Advertising v. Ft. Lauderdale*, 934 F.2d 283, 285 (11th Cir.1991).

The more central issue is whether Granite State has standing to make a facial challenge to Clearwaters's entire sign ordinance on overbreadth grounds. After extensive review, the Court is constrained to find that Granite State has standing to make an overbreadth challenge to those portions of the ordinance that directly implicate, and could accordingly "chill," the First Amendment rights of persons not before the Court, but not to the appeals portion of the permitting section as Granite State was not affected in any way by this provision because it did not appeal the City's denial.

The overbreadth doctrine is "manifestly, strong medicine" that should be use "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).[13] In *Taxpayers for Vincent*, after analyzing the plaintiffs' claims to determine whether they had standing to bring a facial challenge on overbreadth grounds, the Supreme Court found that their challenge was only "as applied" to their activities and heard only the "concrete case" before them. *Taxpayers for Vincent*, 466 U.S. at 802–3, 104 S.Ct. 2118 (plaintiffs did not demonstrate that the ordinance applies to "any conduct more likely to be protected

---

**13.** In *Broadrick*, which dealt with a statutory restriction on political speech activities of government employees, the Court first established limited exceptions to the strict standing test in cases involving "weighty countervailing policies." *Id.* at 611, 93 S.Ct. 2908 (citations omitted). A facial overbreadth challenge is one such exception.

by the First Amendment" than their own). For a valid facial challenge on overbreadth grounds, the Court found that there must be a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 801, 104 S.Ct. 2118. Indeed, the overbreadth of the statute must "not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 800–1, 104 S.Ct. 2118 (*quoting Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908).

■ There is no exact definition of "substantial overbreadth;" however, the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id.* at 800, 104 S.Ct. 2118; *see also Sec'y of the State of Md. v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). "The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine. While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation." *Taxpayers for Vincent,* 466 U.S. at 800–1, 104 S.Ct. 2118 (*quoting New York v. Ferber,* 458 U.S. 747, 772, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). In *Ferber,* the Court rejected an overbreadth challenge to a statute prohibiting persons from knowingly promoting sexual performances by children, even acknowledging that the statute may reach certain educational materials, finding that the "arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach." *Ferber,* 458 U.S. at 773, 102 S.Ct. 3348.

■ Accordingly, the Court turns to whether Granite State's claims fit within the limited exception to the standing doctrine for overbreadth challenges. From the Amended Complaint and Granite State's motions, it appears to mount two distinct facial challenges in its quest to have the ordinance declared unconstitutional: (1) that Article 3, Division 18 is an unconstitutional content-based regulation and vests government officials with "undue discretion," and (2) that Article 4, the permitting and appeals section, is an impermissible "prior restraint" that does not comply with the requirements of *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965),[14] because it contains no time limits for the appeals process.

In Granite State's first overbreadth challenge, it claims that the regulations set forth in Article 3, Division 18, when applied to Granite State, as well as to other third parties who would be denied a sign permit, are in violation of the First Amendment because the sign ordinance is impermissibly content-based on its face. In Granite State's facial challenge to Article 3, it points to several specific provisions which it alleges are constitutionally infirm, but, ironically, not to the provision under which Clearwater denied Granite State's permit applications. Nonetheless, the

---

14. *Freedman* involved a content-based censorship scheme for motion pictures which required certain procedural safeguards to avoid constituting an invalid prior restraint: "(1) any restraint prior to judicial review can be imposed only for a brief period during which the *status quo* must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden once in court." *Freedman,* 380 U.S. at 58–59, 85 S.Ct. 734; *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (limiting the third requirement); *see also Thomas v. Chicago Park,* 534 U.S. 316, 122 S.Ct. 775, 779, 151 L.Ed.2d 783 (2002).

Court finds that Article 3 of Clearwater's ordinance is one that when applied to speech, in the form of signs, may effectively chill First Amendment rights. Hence, the Court is constrained to find that Granite State has standing to challenge Article 3, Division 18 under the limited exception to the standing doctrine for a facial overbreadth challenge.

However, in viewing Granite State's second argument, that the lack of time limits on the appeals process renders it facially invalid, the Court has greater difficulty in finding that Granite State has standing to raise a facial challenge that fits within the limited exception for an overbreadth challenge. Granite State did not appeal the denial of its permit applications; instead, it filed this lawsuit. Granite State contends that it has standing to facially challenge Clearwater's permitting process as an unconstitutional "prior restraint" on speech. Plaintiff points to several cases involving permitting schemes for adult businesses in which the Court allowed a facial challenge to the ordinance based on a lack of time limits on the permitting process. *See, e.g., Redner v. Dean,* 29 F.3d 1495, 1502 (11th Cir.1994) (allowing facial challenge for prior restraint that could result in the "suppression of expressive activity for an indefinite period of time").

Defendant acknowledges, as does this Court, that facial overbreadth challenges are permitted in some circumstances when a permitting scheme is deemed a "prior restraint" and fails to comply with the requirements of *Freedman. See Redner,* 29 F.3d at 1495; *Artistic Entertainment, Inc. v. City of Warner Robins,* 223 F.3d 1306 (11th Cir.2000) (adult business ordinance); *U.S. v. Frandsen,* 212 F.3d 1231 (11th Cir.2000) (park ordinance regarding assembly); *see also Cannabis Action Network, Inc. v. City of Gainesville,* 231 F.3d 761 (11th Cir.2000) (street closing and sound ordinance declared facially unconstitutional as "prior restraint"), *judgment vacated,* —— U.S. ——, 122 S.Ct. 914, 151 L.Ed.2d 881 (Jan. 22, 2002) (remanded to consider in light of *Thomas v. Chicago Park* ).[15] For these requirements to apply, the permitting scheme must be a censorship scheme. *See Thomas v. Chicago Park,* 534 U.S. 316, 122 S.Ct. 775, 780, 151 L.Ed.2d 783 (2002) ("[w]e have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in *Freedman.*"). For reasons discussed *infra,* the Court finds that Clearwater's ordinance is not such a scheme.

Granite State's initial applications were denied within the time provisions provided. Granite State did not seek an appeal of these denials.[16] Hence, it could not be injured by the lack of time limits in the Code's appeals provisions. Without an actual injury under Article 4, the Court cannot extend Granite State's standing to challenge this Article under the limited

**15.** Pending the Eleventh Circuit's reconsideration of *Cannabis Action Network* in light of *Thomas,* this area of the law remains somewhat unsettled.

**16.** For the initial application review, there is a five day time limit for review of the application for completeness and five or ten working days for review of legal sufficiency. *See* § 4-202.C. The Court finds this time limit reasonable. Plaintiff contends that these provisions are unconstitutional because it is not allowed to put up its sign, or automatically move to the next step in the appeals process, if the city fails to act within the prescribed time limit. Although it is preferable to have such a mechanism, if it were to reach the issue, the Court does not find these time periods to be *per se* unconstitutional or unreasonable. *See Thomas,* 122 S.Ct. at 781 (Chicago Park's ordinance has reasonable time limits for application process, but no mechanism if official fails to act within time limits); *see also Outdoor Systems, Inc. v. City of Mesa,* 997 F.2d 604, 613 (9th Cir.1993).

exception for overbreadth, especially in light the Supreme Court's guidance to use it "sparingly". Granite State's injury lies in the enactment of the sign ordinance in Article 3, to which the Court has permitted a facial challenge.[17] *See Messer v. City of Douglasville, Georgia,* 975 F.2d 1505, 1514 (11th Cir.1992) (affirming district court's holding that Messer does not have standing to challenge the board of appeals, as he did not request or receive a hearing—the appeal in this case had been made by the co-defendant billboard companies who had since been dismissed from the case with prejudice).

Moreover, the permitting and appeals process set forth in Article 4 applies to all development review decisions by the City, not just to sign permits. As such, the alleged unbridled discretion of government officials to arbitrarily delay appeal decisions through the lack of time limits in Article 4 is not specific just to speech rights, as Plaintiff alleges with respect to Article 3, but applies equally to other permitting decisions and appeals.[18] Hence, the Court views the reach of Article 4 as much broader—implicating many permitting situations not involving First Amendment rights.

In conclusion, the Court finds that the permitting portion of this ordinance, Article 4, has much less potential to chill the exercise of First Amendment activity than Article 3. Additionally, there is a very limited set of third parties whose First Amendment rights could be chilled under the appeal portion of the regulation;[19] particularly in light of the City's ordinance protecting content of any signs from serving as a basis for denial. *See* § 3–1804.H. Accordingly, the Court declines, for the reasons discussed *supra,* to permit Granite State to raise this type of hypothetical scenario in a facial overbreadth challenge to Article 4.[20] Rather than speculate on a hypothetical case involving an individual whose sign permit was arbitrarily and impermissibly denied, the Court saves this question for another day, and for a plaintiff who has actually been injured by such a delay. *See Messer,* 975 F.2d at 1514. Granite State has suffered no such injury.[21]

17. It should be noted that in Plaintiff's facial challenge to Article 3, it attacks several provisions that involve signs that do not need permits.

18. Although the Court agrees with Granite State that the permitting process is intertwined with the sign ordinance, this argument goes to severability of Article 4, not to whether Granite State has standing to challenge this part of the Code. Severability is discussed in detail *infra.*

19. In *Thomas,* the Court found that if censorship or favoritism occurred, it would be unconstitutional, but should be dealt with on a case-by-case basis. *Thomas,* 122 S.Ct. at 781. Accordingly, if the City appeared to be impermissibly censoring the content of a sign by delaying an appeal (despite the Code's prohibition against making any determination based on the content of the sign), the party could file suit on the grounds that the City's application of its appeal process *to that party* is unconstitutional. Such a suit would challenge the ordinance "as applied" to that plaintiff instead of on a facial basis.

20. Even if Granite State were found to have standing to raise such a claim, the next determination would be whether Clearwater's permitting scheme is an impermissible "prior restraint" on speech. As the Court finds *infra,* Clearwater's ordinance is content neutral and under *Thomas,* the *Freedman* requirements do not apply. *See Thomas,* 122 S.Ct. at 779. The Court would have to agree, however, that were this permitting scheme considered a "prior restraint," the requirements set forth in *Freedman* would control, and the ordinance would be unconstitutional for failing to have time limits on its appeals process.

21. The Court notes the irony of Granite State's claim and the continuing "catch–22" facing governments in drafting regulation to survive First Amendment facial challenges.

### 2. Severability

Granite State argues that any unconstitutional provision(s) of the sign ordinance cannot be salvaged by simply severing them. Generally, Granite State argues that severance would remove incentives to challenge unconstitutional regulations, and specifically, that any alleged sections of Clearwater's sign ordinance which violate equal protection are "inextricably intertwined" with the "whole of the sign ordinance" and to sever any permit requirements from the ordinance would remove "the very heart of the ordinance and impermissibly leave the ordinance more restrictive of speech." (Dkt. # 51 at 3, 13), citing *Rappa v. New Castle County*, 18 F.3d 1043, 1073 (3rd Cir.1994).

On the contrary, Defendants contend that any unconstitutional portions of the ordinance may be severed and specifically point to the severability clause contained within the Code to evidence Clearwater's legislative intent to severe any portions of the Code found to be invalid.[22] Severability of a local ordinance is a question of state law. *See City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988); *see also Metromedia*, 453 U.S. at 521 n. 26, 101 S.Ct. 2882. Under Florida law, the test for severability is as follows: "[w]hen a part of a statute is declared unconstitutional, the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and bad features are not so inseparable in substance that it can be said that the legislature would have passed the one without the other, and (4) an act complete in itself remains after the invalid provisions are stricken." *Waldrup v. Dugger*, 562 So.2d 687, 693 (Fla.1990) (challenging application of revised gain time statute for habeas corpus challenge). The Florida Supreme Court simply stated: "[t]he severability of a statutory provision is determined by its relation to the overall legislative intent of the statute of which it is a part, and whether the statute, less the invalid provisions, can still accomplish this intent." *Ray v. Mortham*, 742 So.2d 1276, 1280 (Fla.1999) (citations omitted).

Courts have noted that the existence of a severability clause carries with it a "presumption" that the legislative authority would have enacted the remaining provisions and that the preference for severance is "particularly strong in cases containing a severability clause." *See Major Media of Southeast, Inc. v. City of Raleigh*, 621 F.Supp. 1446, 1454 (E.D.N.C. 1985) (upholding severability clause). *Cf.*

---

If Granite State was permitted to challenge the constitutionality of Article 4 and this Article was found to be unconstitutional, Granite State would win this case on the basis of a process that it did not utilize. This turns the notion of standing on its head—Granite State could not have been injured by the lack of time limits in the appeals provisions when it did not take advantage of the appeal process! Granite State's real injury was as a result of the application of the height and size requirements of the freestanding sign provision, a provision which it does not directly attack, but to which the Court permits a facial overbreadth challenge.

22. Section 1–107 of the Code provides separately for the severability of any section of the development code, as set forth *supra*. Additionally, this current sign ordinance was part of the Land Development Code passed by Ordinance # 6348–99 on January 21, 1999, which also contained a severability provision: "Section Four. Should any part or provision of this ordinance be declared by a court of competent jurisdiction to be invalid, the same shall not affect the validity of the ordinance as a whole, or any part thereof other than the part declared to be invalid." (App. to Dkt. 42, Tab 17).

*National Advertising v. Town of Niagara,* 942 F.2d 145, 148 (2nd Cir.1991) (finding severance improper despite existence of severability clause); *United States v. Jackson,* 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) (the ultimate determination of severability rarely turns on the presence or absence of a severability clause). Of course, in construing an ordinance for purposes of a facial challenge, the Court must construe any ambiguities in the ordinance as a whole in a manner which avoids any constitutional problems, if possible. *See Southlake Property Ass., Ltd. v. City of Morrow, Ga.,* 112 F.3d 1114, 1119 (11th Cir.1997).

With these guiding principles in mind, the Court addresses Granite State's constitutional challenges to Clearwater's sign ordinance, and specifically addresses Defendants' suggestions that certain provisions, if found to be invalid, may be severed. (*See* Dkt. # 42 at n. 9, 14, 15). In large measure, the Court finds, as set forth in detail *infra,* that most of the provisions Plaintiff alleges are "content-based" or permit "undue discretion" by government officials, do not do so. There are, however, some provisions regarding which the Court agrees with Plaintiff, but finds that those provisions are severable,[23] such that the legislative purpose of Clearwater's sign ordinance is preserved and speech is not more restricted after severance.

### 3. *Content Based v. Content Neutral Distinction*

It is truly a Herculean task to wade through the mire of First Amendment opinions to ascertain the state of the law relating to sign regulations, beginning with the Supreme Court's leading decision on billboard regulations in *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 570, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality decision) (Rehnquist, J., dissenting, who referred to the plurality decision as a "virtual Tower of Babel, from which no definitive principles can be clearly drawn"). As the Court more fully discusses below, there is much variety and diversity of opinions in this area (in addition to sign ordinances, courts have reviewed First Amendment challenges to adult entertainment clubs, tobacco advertising and the noise volume of music concerts), suggesting that constitutional law on this subject is far from clear.

One of Granite State's primary arguments, based in large part on the plurality decision in *Metromedia,* is that the Clearwater sign ordinance is unconstitutional because it is an impermissible content-based ordinance that cannot survive strict scrutiny review. In *Metromedia,* Justice White, writing for the plurality, found that San Diego's sign ordinance was unconstitutional because it impermissibly favored commercial over non-commercial speech. It was also noted that although the ordinance's general prohibition of signs created the "infringement," the additional exceptions to the prohibition "are of great significance in assessing the strength of the city's interest in prohibiting billboards." *Id.* at 520, 101 S.Ct. 2882. Relying on this argument and its claim that the ordinance favors commercial speech over non-commercial speech, Granite State cites to many of the exceptions contained in Clearwater's sign ordinance (for example, construction signs or for sale signs) as evidence that the sign ordinance is content-based.[24]

---

**23.** Because the Court finds that Granite State does not have standing to challenge the lack of time limits in the appeals process in Article 4, it does not reach Granite State's argument that the permitting portion of the ordinance is not severable because it is "so inseparable in substance" that the ordinance would not have been passed without those permitting procedures. If it were to reach such an argument, the Court would agree with Granite State.

**24.** This theory of categorizing an ordinance that provides for, in some cases, legally re-

### The "Catch–22" of Sign Regulations

This almost-conclusory mandate that an ordinance with a category or exception for a sign based on its content automatically makes the ordinance unconstitutional *per se* is the proverbial "catch–22" confronting many cities and municipalities when they attempt to regulate signs in their communities. *See Metromedia*, 453 U.S. at 560, 101 S.Ct. 2882 (Burger, J. dissenting,) ("having acknowledged the legitimacy of local government authority, the plurality largely ignores it").[25] Granite State's argument clearly demonstrates this "catch–22": (1) it is permissible for the government to regulate, or prohibit, signs to further legitimate governmental interests (*Metromedia*); (2) any sign prohibition must provide an exception for "For Sale" signs (*Linmark*); (3) exceptions or regulations of signs requiring a reading of their message are content-based (*Nat'l Advertising Co. v. Town of Niagara*, 942 F.2d 145 (2nd Cir.1991)); (4) content-based sign regulations are generally unconstitutional when subject to strict scrutiny review (*Burson v. Freeman*, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)); and (5) since an exemption allowing "For Sale" signs necessarily requires one to read the words "for sale" on the sign, it is impossible to draft a sign ordinance that is constitutional. Some courts have followed this conclusory theory, *see, e.g., North Olmsted Chamber of Commerce v. City of North Olmsted*, 86 F.Supp.2d 755 (N.D.Ohio 2000); *Nat'l Advertising Co. v. Town of Babylon*, 900 F.2d 551 (2nd Cir.1990); however, others have tried to formulate ways to avoid this "catch–22." *See, e.g., Rappa v. New Castle County*, 18 F.3d 1043 (3rd Cir.1994).[26]

### Review of Relevant Cases

It is instructive to review the Supreme Court's seminal decisions in this area. Justice Stevens, who filed a dissenting opinion in *Metromedia*, authored the Court's majority opinion in *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), which discussed at great length the general principles, history and other cases involving the First

quired exceptions, and in other cases, justifiable exceptions, as content-based first began with the Supreme Court's decision in *Linmark Assoc., Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), which held that the city's interest in maintaining stable and racially integrated neighborhoods was not sufficient to support a ban on residential "for sale" signs. *Id.* at 93, 97 S.Ct. 1614.

25. In fact, the other dissenting opinions in *Metromedia* recognize San Diego's ordinance as viewpoint neutral such that the exceptions are rendered content neutral. *Metromedia*, 453 U.S. at 541–42, 554, 101 S.Ct. 2882 (Stevens, J., dissenting in part); 565 (Burger, J., dissenting); 570 (Rehnquist, J., dissenting).

26. In *Rappa*, the Third Circuit attempted to deal with the issue of whether exemptions to a sign ordinance makes the ordinance unconstitutional. *Rappa* focused on the relationship between the content of a sign and its particular location or use. *Rappa*, 18 F.3d at 1065. The decision in *Rappa* took the position that due to the lack of agreement in reasoning, there was little discernable law on this issue from *Metromedia*. *Id.* at 1056–60. Although the ordinance was ultimately struck down, the Third Circuit recognized that the city's purpose in enacting a particular exemption is significant, especially as related to the governmental interest it was enacted to further. *Id.* at 1043, 1063 (finding that the exceptions are "quite small ... not for particular subjects likely to generate much debate ... and do not discriminate by viewpoint. Thus, they do not appear to be motivated by a desire to suppress certain speech... in a way that makes it likely that the government is aiming to shape the public agenda or is in fact significantly affecting the shape of that agenda."). *See also Outdoor Media Dimensions Inc. v. State of Oregon*, 150 Or.App. 106, 945 P.2d 614, 622 (1997) (finding distinction between on-premises and off-premises advertising is not content-based restriction).

Amendment, beginning with the country's first printing presses and censorship of movies,[27] stressing the "unacceptable risk of suppression of ideas." *Id.* at 797, 804, 104 S.Ct. 2118 (concluding that the "general principle that has emerged from this line of cases is that the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others"). In *Taxpayers for Vincent,* the Court upheld an ordinance prohibiting the posting of handbills and signs on public property and public objects (like utility poles), because it found that it was within that city's constitutional power to attempt to improve its appearance, an interest that was "basically unrelated to the suppression of ideas" and the ordinance was reasonably tailored to do so, with available alternative channels of communication. *Id.* at 804, 813–15, 104 S.Ct. 2118. The Court held "there is not even a hint of bias or censorship in the City's enactment or enforcement of this ordinance. There is no claim that the ordinance was designed to suppress certain ideas the City finds distasteful or that has been applied to Appellees because of the views that they express." *Id.* at 804, 104 S.Ct. 2118. This decision suggests that an ordinance need only be subject to strict scrutiny if it serves to regulate a particular viewpoint or amounts to censorship.[28]

This content-based theory warranted mention by the Court in a non-sign case,

*Cincinnati v. Discovery Network,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (Stevens, J. delivered the majority opinion). *Discovery Network* involved the city's attempt to enforce an ordinance banning "commercial handbills" on public property by ordering the removal of newsracks from which the "commercial handbills" were disseminated. These newsracks looked just like those containing newspapers. The Court found the ordinance unconstitutional primarily because it was not a "reasonable fit" of the city's legitimate interests in aesthetics and safety and their chosen means of furthering those interests, a "sweeping ban" on the "commercial handbill" newsracks which were only a small fraction of the total newsracks on the street. *Id.* at 428–29, 113 S.Ct. 1505.

After so holding, the Court discussed the content-based versus content-neutral distinction, finding that the ban on newsracks with "commercial handbills" was impermissibly content-based. *Id.* at 428–9, 113 S.Ct. 1505. Beginning with the premise that the government may impose "reasonable restrictions on time, place, or manner of engaging in protected speech provided that they are adequately justified 'without reference to the content of the regulated speech,'" the Court was not persuaded that the justification of preserving aesthetics and safety adequately justified the regulation because "the very basis of the regulation is the difference in content between ordinary newspapers and commercial speech." *Id.* at 429, 113 S.Ct. 1505.[29] Although this is one of the few

27. *See Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (striking down a state motion picture censorship statue as unconstitutional which required theater to submit film to state board of censors before exhibiting it).

28. One commentator concluded that *Taxpayers for Vincent* "impliedly overruled" the content-based discrimination theory from *Metromedia,* emphasizing the need for "viewpoint rather than content neutrality." Ger-

ard, Jules, B., "Evolving Voices in Land Use Law: Election Signs and Time Limits," 3 Wash. U.J.L. & Pol. 379, 383 (2000). He noted that the ordinance at issue in *Taxpayers for Vincent* contained a "host of specific exemptions that were similarly identical to those that have proved fatal to the San Diego ordinance in *Metromedia.* The *Vincent* court simply ignored them." *Id.*

29. The Supreme Court noted that "[u]nder the city's newsrack policy, whether any par-

commentaries by the Supreme Court on this specific issue, it does not appear to be critical to the Court's holding, which focused primarily on the lack of "reasonable fit."[30]

Earlier, in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), the Court upheld a municipal regulation that required performers to use sound technicians and a sound system provided by the city, finding that it did not violate the free speech rights of the performers. The Court held that the regulation (of the expressive activity of music) is content-neutral, "so long as it is justified without reference to the content of the regulated speech." *Id.* at 791, 109 S.Ct. 2746 (citations omitted). The Court found the government's purpose of controlling noise levels at bandshell events was a "controlling consideration... [that had] nothing to do with the content." *Id.* at 791–2, 109 S.Ct. 2746 (citations omitted). The Court also considered, and rejected, the plaintiff's argument that the statute was unconstitutional on its face because it placed "unbridled discretion in the hands of city officials charged with enforcing it." *Id.* at 793, 109 S.Ct. 2746 (citations omitted). The Court concluded that the city's regulation was narrowly tailored to serve a significant government interest by protecting its citizens from unwelcome noise. *Id.* at 796, 109 S.Ct. 2746.

It is also instructive to review the Supreme Court's ruling in *Ladue v. Gilleo*, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). This case involved an ordinance that banned all residential signs except those falling within one of ten exemptions. The petitioner resident wanted to place a sign about the war in the Persian Gulf—first on her front lawn, and when that was denied, then in the window of her home. *Id.* at 45–46, 114 S.Ct. 2038. The Court found that the ordinance violated the resident's right to free speech, in large part because there were no alternative means of communication for her. *Id.* at 54, 114 S.Ct. 2038. The Court found that as a resident, the plaintiff was "almost completely foreclosed in any venerable means of communication that is both unique and important." *Id.* As Justice O'Connor added in her concurrence, the Court circumvented its "normal inquiry," which first determines whether a regulation is content-based or content-neutral, then applies the appropriate level of review (i.e. strict or intermediate scrutiny). *Id.* at 59, 114 S.Ct. 2038 (O'Connor, J., concurring). Justice O'Connor even goes so far as to note that regulations are "occasionally struck down because of their content-based nature, even though common sense may suggest that they are entirely reasonable... [t]he content distinctions present

---

ticular newsrack falls within the ban is determined by the content of the publication resting inside the newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content-based.'" *Id.* These troubling words seem to invite the type of automatic or *per se* strict scrutiny analysis that makes regulating signs a risky business. Yet, the Supreme Court continues, "[i]t is the absence of a **neutral justification** for its selective ban on newsracks that prevents the city from defending its newsrack policy as content neutral." *Id.* at 429–30, 101 S.Ct. 2882 (emphasis added). Also, as discussed in greater detail *infra*, the Su-

preme Court has approved other ordinances with exemptions that arguably fit this analysis, such as the one in *Thomas v. Chicago Park Distr.*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002).

**30.** The facts reveal that the ordinance was not a reasonable fit for the government's interest in promoting aesthetics (or preventing "visual blight" caused by littering) since the reduction in the overall number of newsracks would be "minute" or "paltry"—only 62 out of a total of 1500–2000. *Discovery Network*, 507 U.S. at 417–18, 113 S.Ct. 1505.

in this ordinance may, to some, be a good example of this." *Id.* at 60, 114 S.Ct. 2038.

It is equally instructive to review the Supreme Court's most recent rulings on the facial constitutionality of a municipal park ordinance as reviewed under the First Amendment. *See Thomas v. Chicago Park Distr.*, 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). *Thomas* involved a municipal park ordinance requiring individuals to obtain a permit before conducting events for more than fifty persons and providing an application process with a fourteen day time limit for granting or denying the application. Applications could be denied on any of thirteen specific grounds. An applicant is given seven days to appeal the decision on the application after which it may seek judicial review in state court by common law certiorari. The plaintiffs in *Thomas* sought to secure a permit to hold a rally advocating the legalization of marijuana. Upon the denial of their application, they filed an action alleging that the ordinance was unconstitutional on its face. The Supreme Court found otherwise, upholding the ordinance as content-neutral.

This Court notes that most of Chicago Park's listed grounds to deny a permit, eleven of which are noted in footnote 1 of the Court's opinion, are decidedly content-

neutral. *Id.* at 777 n. 1. For example, a permit may be denied [31] if the application is not complete, the application fee is not attached, or the applicant is legally incompetent to contract. *Id.* Yet, interestingly, others may be construed as being more "content-based." For example, a permit may be denied if the "use or activity intended by the applicant would present an unreasonable danger to the health or safety of the applicant, or other users of the park ... or the public" or a permit has previously been granted authorizing uses that "do not reasonably permit multiple occupancy of the particular park or part thereof." *Id.* But these grounds are clearly not using any content distinction as a censorship scheme nor are they an attempt to limit activities in the park based on the applicant's viewpoint. In fact, the Court upheld the park ordinance as a "content-neutral time, plan and manner regulation," finding that the licensor is not authorized to "pass judgment on the content of the speech" and that "[n]one of the grounds for denying a permit has anything to do with what a speaker might say." *Id.* at 779.

In comparison, the Supreme Court did not agree with the plaintiffs that the park ordinance was like the censorship scheme in *Freedman v. Maryland*,[32] which would

---

**31.** The Court did not find the fact that the government "may" deny the permit rather than "must" do so allows them to impermissibly waive the permit requirements for some "favored speakers" while insisting upon them for others, which would clearly constitute unconstitutional conduct. *Id.* at 781 ("[t]hat is certainly not the intent of the ordinance" as the government has "reasonably interpreted" it to "permit overlooking only those inadequacies that [ ] do no harm to the policies furthered by the application requirements"). The Court cautioned that if and when a situation of "unlawful favoritism" were to occur, such an abuse "would be dealt with," rather than "insisting upon a degree of rigidity that is found in few legal arrangements." *Id.*

**32.** As set forth *supra*, *Freedman* involved a content-based censorship scheme which required certain procedural safeguards: "(1) any restraint prior to judicial review can be imposed only for a brief period during which the *status quo* must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden once in court." *Freedman*, 380 U.S. at 58–59, 85 S.Ct. 734. *See also FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 227, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Thomas*, 122 S.Ct. at 779.

have required that litigation be initiated by the park district every time it denies a permit and that the ordinance specify a deadline for judicial review. *Id.* at 779. Specifically, the Court found that the park's licensing scheme was not "subject matter censorship" and as a "content-neutral time, place, and manner regulation of the use of a public forum," it does not have to adhere to the procedural requirements set forth in *Freedman. Id.* at 779–80. The Court also found that government officials were not given unduly broad discretion in determining whether to grant or deny a permit. *Id.* at 780–81.

### Application to Clearwater Ordinance

Of course, Defendants argue that the Clearwater's sign ordinance is similar to the ordinance in *Thomas* in that the requirements of *Freedman* do not apply because it is content-neutral. Defendants further maintain that if Clearwater's Code were subject to a more limited variation of the *Freedman* requirements,[33] it would meet this higher level of review because the sign permitting decisions must be made within a limited time period and are subject to judicial review. (Dkt. # 42 at 23). Granite State opposes this argument in part because it believes that the Clearwater ordinance is not content-neutral, and also because government officials are allowed undue discretion (as discussed *infra* ).

 One of the few issues that is clear under the Supreme Court's decision in *Metromedia* is that government is permitted to regulate speech through sign ordinances that are not content-based, provided they are narrowly tailored to further the significant government interests. *Metromedia,* 453 U.S. at 511–12, 516, 101 S.Ct. 2882. Once a regulation is found to be viewpoint-neutral, it is subject to inter-

mediate scrutiny, which requires that the state demonstrate that: 1) the act serves a substantial governmental interest (unrelated to the suppression of free expression), and 2) it is narrowly drawn to serve that interest without unnecessarily interfering on First Amendment freedoms (that is, the restriction in First Amendment freedoms is no greater than is essential to the furtherance of the interest). *Taxpayers for Vincent,* 466 U.S. at 805, 104 S.Ct. 2118. The Eleventh Circuit summarized that to uphold a viewpoint-neutral regulation of speech, a government must show that "1) it has the constitutional power to make the regulation, 2) an important or substantial government interest unrelated to the suppression of free speech is at stake, and 3) the ordinance is narrowly drawn to achieve its desired ends, leaving other channels for the communication of information." *Messer v. City of Douglasville, Ga.,* 975 F.2d 1505, 1510 (1992). Indeed, in *Messer,* the Eleventh Circuit upheld a limit on the use of portable signs as a partial solution for its aesthetic concerns, stating "[since] it could have prohibited *all* portable signs in furtherance of this interest, by allowing a limited number, it is in fact more narrowly tailoring the restrictions to meet its purpose." *Messer,* 975 F.2d at 1514. However, it need not be the least restrictive means possible. *See Rock Against Racism,* 491 U.S. at 781, 109 S.Ct. 2746. And, the ordinance should leave open ample alternative channels of communication.

The Supreme Court specifically addressed two "significant government interests" in *Metromedia*—traffic safety and aesthetics of the community. *Metromedia* 453 U.S. at 509–10, 101 S.Ct. 2882 ("[t]here is nothing here to suggest that these . . . accumulated, common-sense judgments of

---

**33.** Citing *FW/PBS, Inc.,* 493 U.S. at 215, 110 S.Ct. 596, Defendants argue that only the "latter two procedural safeguards" from

*Freedman* are required where there is no censorship scheme or element.

local lawmakers and of the many reviewing courts that billboards are real and substantial hazards ... are unreasonable... [w]e reach a similar result with respect to the second asserted justification for the ordinance—advancement of the city's esthetic interests. It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an esthetic harm") (citations and quotations omitted). It is also clear from the decision in *Taxpayers for Vincent* that a state may legitimately exercise its police powers to advance its aesthetic interests and traffic safety. *See Taxpayers for Vincent*, 466 U.S. at 806–07, 104 S.Ct. 2118 (in effect affirming *Metromedia*'s holding that a city's aesthetic interests are sufficiently substantial to provide an acceptable justification for a content-neutral prohibition against the use of billboards). *See also Messer*, 975 F.2d at 1510 (it is "well settled that both traffic safety and aesthetics are substantial governmental goals"); *Southlake Property Assoc., Ltd. v. City of Morrow, Ga.*, 112 F.3d 1114, 1116 (11th Cir.1997) (recognizing Morrow's right to "clean, aesthetically pleasing and safe business thoroughfares"); *Harnish v. Manatee County, Fla.*, 783 F.2d 1535 (11th Cir.1986) ("prohibition of portable signs to eliminate aesthetic blight passed muster under the First Amendment").

But what is not clear from *Metromedia*, or the Court's other decisions, is exactly *how* a city or municipality can constitutionally regulate signs to further these interests. Many courts, like this one, and many commentators, are concerned that local governments have been placed in a tenuous and near impossible position in drafting a constitutional or content-neutral sign ordinance. *See, e.g.,* Cordes, Mark, "Sign Regulation After *Ladue:* Examining the Evolving Limits of First Amendment Protection," 74 Neb. L.Rev. 36 (1995); Bond, R. Douglass, "Making Sense of Billboard Law: Justifying Prohibitions and Exemptions," 88 Mich. L.Rev. 2482 (1990).

In essence, courts are left to define the constitutional perch upon which local governments may rest on the slippery slope of permissible content-neutral regulations. It is impossible not to acknowledge, as this Court does, that a sign ordinance must be justified by something other than its content, stressing Justice Stevens' opinion that the First Amendment (and the resulting content-based distinction) was created to protect speech from the dangers of government censorship and to stop the government from suppressing the expression of ideas and public debate through the guise of regulation. *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). *See also Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *Rappa v. New Castle County*, 18 F.3d 1043 (3rd Cir.1994).

What makes the content-based versus content-neutral distinction so difficult in cases involving sign ordinances is that, by their very nature, signs are speech and thus can only be categorized, or differentiated, by what they say. This makes it impossible to overlook a sign's "content" or message in attempting to formulate regulations on signage and make exceptions for distinctions required by law (i.e., for sale signs) or for those signs that are narrowly tailored to a significant government interest of safety (i.e., warning or construction signs). For example, there is simply no other way to make an exemption or classify a for sale sign as a for sale sign without reading the words "For Sale" on the sign, or classifying a sign as a warning sign without reading the words "Warning Bad Dog" on the sign. In many cases, this classification raises the "red flag" of an

impermissible [34] "content-based" regulation. *See Metromedia,* 453 U.S. at 565, 101 S.Ct. 2882 (Burger, J. dissenting) (referring to differentiating among topics and "noncontroversial things" and "conventional" signs such as time-and-temperature signs, historical markers, and for sale signs).

Hence, in looking at the general principles of the First Amendment as the Court did in *Taxpayers for Vincent,* the real issue becomes whether the distinctions or exceptions to a regulation (as well as any areas of government discretion) are a disguised effort to control the free expression of ideas or to censor speech. Common sense and rationality would dictate that the only method of distinguishing signs for purposes of enforcing even content-neutral regulations, such as number, size or height restrictions, is by their message. For example, a regulation permitting a freestanding billboard sign to be larger than a political yard sign which is larger than an address sign is a differentiation based on content (albeit for purposes of regulating size). This should not, on its own, render an ordinance unconstitutional. Indeed, it appears to be a matter of semantics.[35] In

rendering its opinion today, this Court focuses on whether the government regulation is trying to impermissibly censor speech or limit the free expression of ideas.

The Court finds that Clearwater's ordinance is, in general, not content-based and therefore does not require strict scrutiny review. However, in making this finding and given the guiding principles set forth *supra* regarding severance, the Court finds that some provisions of the sign ordinance are impermissible, but severable, eliminating any unjustified content-based distinctions and preserving the content neutrality of the sign ordinance.[36]

### Specific Provisions of Clearwater's Ordinance

■ Initially, the Court addresses two patently inconsistent provisions in Clearwater's ordinance regulating window signs. Section § 3–1803.U prohibits temporary window signs in residential areas whereas § 3–1805.Q allows window signs "up to eight square feet in area ... on any window area provided such sign does not exceed 25 percent of the total area of the window where the sign is located... [i]n

---

**34.** Of course, if a content-based regulation were to withstand strict scrutiny, it would not be impermissible. *See Burson v. Freeman,* 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) ("it is the rare case in which we have held that a law survives strict scrutiny"). *See also Amer. Library Assoc. v. United States,* 2002 WL 1126046 (E.D.Pa. May 31, 2002) (statute requiring filtering of Internet at libraries cannot withstand strict scrutiny because the use of filters are not narrowly tailored to further government's legitimate interests).

**35.** Even differentiations previously approved could be considered "content-based" as they fit within the troubling distinction made in *Discovery Network. See Messer,* 975 F.2d at 1509 (on-premise and off-premise distinction); *Outdoor Systems, Inc. v. City of Mesa,* 997 F.2d 604, 613 (9th Cir.1993) (same).

**36.** Granite State contends that there are "dozens of content-based limitations on speech" in Clearwater's ordinance—"too many to discuss in detail"—and cites to more than 25 different provisions of the ordinance, concluding that the ordinance is "unquestionably and repeatedly content-based." *See* Dkts. 17, p. 14, n.3; 51, pp. 9–10, n.4. The Court discusses many of these provisions in more detail *infra;* however, the Court also finds that many of them are *de minimus* exceptions such as holiday decorations, marina slip numbers or garage or yard sale signs; or legally required or justifiable exceptions such as for sale or construction signs; or others are simply not content based such as flags, pavement markings or signs attached to vegetation. The Court disagrees with Granite State that this list of exceptions renders the ordinance unconstitutional *per se.*

no case shall the cumulative area of all window signs erected exceed 24 square feet in area." Section 3–1805.Q makes no residential/non-residential distinction. These provisions are in direct conflict. As Defendants suggest, the Court can easily sever § 3–1803.U, leaving § 3–1805.Q regulating window signs. In doing so, the Court thus construes Clearwater's sign ordinance, as it must, in such a way as to preserve its constitutionality. Additionally, the Court succeeds in increasing, instead of restricting, speech, by severing § 3–1803.U, rather than § 3–1805.Q.

 The Court next turns to § 3–1803 which lists twenty-six types of signs that are prohibited, such as roof signs, portable signs or signs that present traffic or pedestrian hazards. Section 3–1803.T prohibits "snipe" signs. This is defined as "an off-premises sign which is tacked, nailed, posted, pasted, glued or otherwise attached to trees, poles, stakes, fences or to other objects." § 8–102. But Clearwater's sign ordinance already prohibits signs attached to trees in § 3–1803.R and allows attached signs in § 3–1806.B.3. To the extent the portion of the definition of a snipe sign prohibits attaching signs to "other objects" contradicts the provision allowing attached signs, it cannot stand. Accordingly, in keeping with the guiding principles set forth *supra* regarding severance,

the Court finds that part of the definition of snipe signs is severable and must therefore be stricken.

 In another provision of this section, § 3–1803.B,[37] the Court finds that this provision makes an unjustified content-based distinction on these signs for governmental and public purpose signs. Like *Discovery Network,* it does not appear that there is a "reasonable fit" in making a distinction between governmental and public purpose signs (for a limited time and frequency) and non-governmental and non-public purpose signs (for a limited time and frequency). In furthering the governmental interests of the aesthetics and traffic safety, the Court can discern no justifiable distinction between these types of signs as it relates to the government interests of aesthetics and traffic safety.[38] Moreover, the existence of this provision undermines the content-neutrality of the ordinance.

Accordingly, under the general principles guiding severance set forth *supra,* the Court strikes this entire provision. Because this provision is included in the list of prohibited signs, the Court finds that it is unable to sever just the portion of the provision which makes the content-based distinction (government and public purpose signs) as that would be result in a

---

**37.** This section prohibits certain signs, including "[b]alloons, cold air inflatable, streamers, and pennants, except where allowed as governmental and public purpose signs for special events of limited time and frequency, as approved by the city manager or the city commission."

**38.** Although it is not necessary to get beyond this initial finding of an impermissible content-based distinction, the Court notes that it is not persuaded by Defendants' supporting affidavit attesting that the only approval made under this provision is for "cold air inflatable" figures "for temporary events held in Coachman Park or held in connection with

the annual Jazz Festival." Tarapini Aff., ¶ 11. *See Forsyth Cty. v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (in facial challenge of assembly and parade ordinance, court considers the city's own "implementation and interpretation" of ordinance). Nor is the Court persuaded by Granite State's argument that government officials have unbridled discretion in their decision whether to approve such signage. *See id.* at 126–27, 112 S.Ct. 2395 (impermissible to allow government administrator to vary the of amount of fees to be paid for permit without reference to objective standards and by using his "own judgment of what would be reasonable").

greater restriction on speech by totally banning balloon, cold air inflatables, streamers and pennants.[39]

Granite State also contends that § 3–1803.Y[40] is an impermissible content-based distinction that renders the ordinance unconstitutional. The Court disagrees. This section forms the "catch-all" provision in the list of prohibited signs. Granite State seems to argue, in a conclusory fashion, that this provision is invalid simply because it prohibits signs not specifically enumerated within the Code. Finding the ordinance content-neutral, the Court does not reach the same conclusion.

Plaintiff attacks only two provision of § 3–1804, which sets forth "General Standards" for Clearwater's sign ordinance. In reviewing this section, the Court finds that it does not contain impermissible content-based distinctions.

■ Specifically, Granite State contends that §§ 3–1804.E and F are impermissible content-based exceptions that render the ordinance unconstitutional. These provisions are contained in the part of the ordinance addressing "General Standards" and specifically regulate the placement, size and location of gasoline price signs (subsection E) and time and temperature signs (subsection F). The Court again disagrees with Plaintiff's conclusion. These sign categories and the regulations therein are good examples of how the Court finds that this ordinance is content-neutral. These provisions are not an attempt to censor speech or enforce regulations based on viewpoint—a time and temperature sign or gasoline price sign has no viewpoint, it merely relates factual information. Hence, these provisions are

not an attempt to censor speech or limit the free expression of ideas—especially in light of Clearwater's specific prohibition on placing any limitation on a sign based on the content of the message. *See* § 3–1804.H.

Section 3–1805 contains a list of twenty types of signs that are "permitted without a permit." By far the most controversial provision (and one which has been similarly attacked in other cases), is the provision on temporary yard signs and corresponding time limits to display these types of signs.

### Temporary Yard Signs

■ Granite State also contends that Clearwater's regulations on temporary yard signs set forth in § 3–1805.N are unconstitutional. There are two regulations on the size and duration of temporary yard signs: (1) yard signs "for each political candidate or issue for each frontage per parcel of land" are permitted "no sooner that 60 days prior to the election for which they were intended, and shall be removed within seven days after the election for which they are intended," not to exceed six square feet in area on residential land or thirty-two square feet of total sign face area on non-residential land, and (2) "other" temporary signs are "allowed to be displayed *in residential areas*" "no more than three times a year for a total of 90 days during a one year period" and may not to exceed six square feet in size.

The Supreme Court has upheld the "unique and important" right of residents to post political signs at their residences. *See City of Ladue v. Gilleo*, 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994)

---

**39.** Although the Defendants apparently read this provision as being applicable to public property (*see* Dkt. # 42 at 25–6), these words are not contained in this provision of the ordinance. If this were the case, the Court may have come to a different result.

**40.** This provision prohibits "[a]ny sign that is not specifically described or enumerated as permitted within the specific zoning district classifications in this development code."

(finding that sign ordinance banning residential signs violated plaintiff's right to free speech by prohibiting her from displaying a sign stating "For Peace in the Gulf" from her home). The Court stressed that displaying a sign from one's own residence carries a message quite distinct from placing the sign someplace else or conveying the same text or picture by other means, "for it provides information about the speaker's identity, an important component of many attempts to persuade." The Court also stressed that residential signs are a fairly cheap and convenient form of communication and there was not sufficient alternative means for the plaintiff in *Ladue* to express her message. *Id.* at 2045. Given the priority the Supreme Court placed on political signs at residences, Clearwater has not banned yard signs, but merely placed time limits and size limitations on the yard signs in this provision. Additionally and significantly, Clearwater also allows window signs pursuant to the regulations this Court has upheld in § 3–1805.Q (limiting the signs to no more than 25% of the window). With this reasonable alternative of communication available, this case moves outside the province of *Ladue.*

Other cases have specifically addressed political speech. For example, the Court has held that singling out political speech is not *per se* unconstitutional. *See, e.g., Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (upholding government's right to refuse to accept political advertising for space on city transit system buses); *see also Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (upholding government's right to limit locations on public fairground to distribute religious literature). Courts, and commentators, have also addressed whether a time limitation on political signs is constitutional. *See Whitton v. City of Gladstone,* 54

F.3d 1400, 1403–04 (8th Cir.1995) (thirty day time restriction on political signs is unconstitutional); *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.,* 266 Ga. 393, 467 S.E.2d 875, 882 (1996) (striking down time limits of seven weeks on political signs); *Collier v. City of Tacoma,* 121 Wash.2d 737, 854 P.2d 1046 (1993) (prohibiting political signs sixty days before election was unconstitutional); *see also* Gerard, Jules B., "Evolving Voices in Land Use Law: Election Signs and Time Limits," 3 Wash. U.J.L. & Pol. 379 (2000). At least one case has found a reasonable time limit after the election to take down an election-related sign is constitutional. *Collier v. City of Tacoma,* 121 Wash.2d 737, 854 P.2d 1046, 1057 (1993).

In this case, the sixty day time limit, as written, may actually extend to a total of 127 days if there were a primary and general election (sixty days for each, plus seven days after the election). Although this Court finds this time period reasonable (in some part because there are sufficient alternative forums of expression available, i.e., window signs), in the totality of the case law and commentary on this issue, the Court feels constrained to find that the sixty day time limit is unconstitutional, with the exception of the seven day limit on removing the sign after the election. The Court finds this seven day time period for removal is a reasonable limitation justified by Clearwater's purpose of controlling aesthetics.

However, for the reasons indicated *supra,* the Court finds that the sixty and ninety day time limits are severable by striking them; thus increasing speech and maintaining the constitutionality of the ordinance. On this issue, the Court agrees with the reasoning of a similar case, *Brayton v. City of New Brighton,* 519 N.W.2d 243 (Minn.1994) (upholding ordinance that allowed one non-commercial sign all year long and additional non-commercial signs

during the election season). Accordingly, the Court finds that § 3–1805.N is constitutional after the sixty and ninety day time limits are severed; thus, allowing one temporary yard sign "for each political candidate or issue" with no time limit except that the sign(s) shall be removed within seven days after the election for which it/they are intended, and the other temporary yard sign (in residential areas) is allowed without a time limitation. The size requirements set forth in § 3–1805.N remain unchanged.

Additionally, Plaintiff contends that §§ 3–1806.A.1–3 are impermissible content-based provisions. These sections delineate specific height and size requirements for certain residential signs that require permits and development review (i.e., freestanding subdivision development entry signs, freestanding multifamily entry signs, school and park identification monument signs). This section also allows certain commercial signs (freestanding, monument and transit shelter signs) with a permit and specifies size, height and illumination requirements. After a thorough review of this section, the Court finds it to be a content-neutral time, place and manner restriction of certain signs that require a permit whether they appear in residential or commercial areas. The Court does not agree with Plaintiff that these provisions of the sign ordinance are content-based (and therefore *per se* unconstitutional). As described *supra*, these provisions do not limit the expression of ideas or censor speech.

In conclusion, the Court finds that the regulations contained in Article 3, Division 18 are not facially unconstitutional, after certain provisions are severed. Hence, the Court turns to whether the ordinance permits undue discretion by government officials.

### 4. *Discretion of Government Officials*

 Where licensing is applicable to speech, the discretion of the licensing official must be limited to avoid the dangers of censorship. As Justice Scalia explained for the unanimous Court in *Thomas:*

> Of course even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content. We have thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review.

*Thomas,* 122 S.Ct. at 780 (citations omitted). A court may look to well-understood or uniformly applied practice or binding administrative construction to set limits on official discretion that are not otherwise apparent from the face of the regulation. *See, e.g., Griffin v. Sec'y of Veterans Affairs,* 288 F.3d 1309 (Fed.Cir.2002).

With that in mind, the Court turns to Granite State's argument that Clearwater's sign ordinance does not provide adequate standards to guide the city's officials in approving or denying certain signs or permits. In some cases, the Court agrees and finds that a particular section should be stricken. In others, the Court finds that the government's discretion is acceptable or reasonable.

 The Court agrees with Granite State that § 3–1805.C.2 [41] vests city offi-

---

**41.** This section allows certain signs without a permit and reads as follows: "[o]ther temporary special event and/or public purpose signs of a temporary nature may be approved on a case by case basis. The type of sign, size, design and length of display shall be determined by the community development coordinator."

cials with too much discretion in allowing temporary special event or public purpose signs without a permit. Even though the provision only relates to signage for a "temporary special event and/or public purpose," the approval and sign type, size and length of display is determined by a government official on a "case by case basis." There is no other criteria guiding the official's decision. As such, this section allows the government too much discretion and cannot withstand constitutional challenge. However, in analyzing whether this section is severable, the Court agrees with Defendants that this section may be severed in its entirety. (*See* Dkt. 42 at n.8).

██ The Court also agrees with Granite State that § 3–1803.L [42] vests too much discretion in officials in granting exceptions for certain signs that are located on public land with the permission of the city manager or city commission. Again, the Court finds that the remainder of this ordinance may be upheld as constitutional by simply striking the portion of the ordinance that allows the impermissible discretion. Accordingly, the Court upholds this section of the ordinance by striking the words "signs required or erected by permission of the city manager or city commission" from the provision, leaving the rest of the provision unchanged and intact.

██ Granite State also argues that § 3–1806B.5 [43] gives government officials unbridled discretion in determining whether to permit changeable copy signs. Specifically, Granite State contends that the

phrase "significant public purpose" gives officials impermissible discretion in the permitting process. The Court disagrees with Plaintiff and finds that the discretion to ascertain what constitutes a "significant public purpose" is reasonable, especially given that this section only applies to signs on public property. *See Taxpayers for Vincent*, 466 U.S. at 812–15, 104 S.Ct. 2118 (upholding regulations on signage on public property); *see also Heffron; Lehman.* Accordingly, the Court finds this regulation, and the discretion to determine a "significant public purpose," reasonable.

██ Granite State also contends that the Comprehensive Sign Program in § 3–1807 allows officials too much, and therefore, impermissible, discretion in denying sign applications. This section is specifically designed to allow deviations from the requirements· of the other sign provisions (except monument signs) provided they comply with the flexibility criteria set forth therein. *See* § 3–1807.B, C. The flexibility criteria covers signs designed as part of a architectural theme (C.1); specifies certain height, size and lighting requirements (C.2—4); does not permit signs that have an "adverse impact" on "community character" or surrounding property values (C.5—6); eliminates "existing unattractive signage" or results in "improvement of appearance" (C.7); and allows signs "consistent with any special area or scenic corridor plan (C.8)". The Court finds that this criteria is sufficiently objective and clear such that it does not give officials undue or impermissible discretion.

---

**42.** This section prohibits certain signs and this provision includes "[s]igns located on publicly owned land or easements or inside street rights-of-way, except signs required or erected by permission of the city manager or city commission, signs or transit shelters erected pursuant to section 3–2203, and sandwich board signs to the extent permitted in the downtown district". Prohibited signs shall include but shall not be limited to hand-

bills, posters, advertisements, or notices that are attached in any way upon lampposts, telephone poles, utility poles, bridges, and sidewalks.

**43.** This section allows certain signs by permit through the development review process and reads as follows: "[c]hangeable copy signs provided located on public property serving a significant public purpose."

### 5. *Equal Protection Challenges*

Granite State also claims that the ordinance violates the equal protection clause because it impermissibly favors commercial speech over non-commercial speech. The real basis of Granite State's equal protection claim is that the ordinance favors "commercial speech of certain businesses about certain commercial topics while prohibiting other legal and truthful and commercial information." (*See* Amded Compl., ¶¶ 57, 65). Granite State cites, as an example, certain provisions that allow businesses such as gas stations, the construction industry, restaurants, and marinas to post signs while claiming that these provisions do not allow other businesses, such as Granite State, to do the same.

Within the context of commercial speech, the Court finds that the Code's exemptions of certain signs, such as gas price signs and construction signs, are rationally related to the advancement of the enumerated purposes of the Code. Just as the Court has found that the other exemptions in the Code are a "reasonable fit" between the Defendants' means and the ends of satisfying First Amendment concerns, so it similarly finds for the commercial speech Plaintiff alleges is impermissibly favored. As the Court reasoned *supra*, the ordinance is content or viewpoint-neutral (after severing certain provisions) and the exemptions in the ordinance are not impermissible content-based restrictions.

■ Moreover, as it relates to commercial speech, the Court finds that the restrictions are valid under the *Central Hudson* analysis because they seek to implement and directly advance substantial government interests and reach no further than necessary to accomplish that objective. As other courts have held, the government may make certain restrictions on commercial speech, which is not entitled to as much protection as non-commercial speech. *See, e.g., Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *see also Metromedia*, 453 U.S. at 506, 101 S.Ct. 2882.

■ Granite State also contends that the Code violates equal protection by impermissibly favoring noncommercial speech over commercial speech. (Dkt. # 19 at pp. 5–6, n. 1). Plaintiff provides a rather simplistic example that a sign measuring sixteen square feet could be posted in a residential district without a permit as long as it contained a (commercial) message regarding construction. (*See* § 3–1805.F.1). Granite State correctly points out that if a permit was requested for the same sign to say "Save the Whales" (a noncommercial message), the application would be denied. (*See* § 3–1805.N.1, 2; 3–1803.Y).

As the Court has ruled *supra*, Clearwater's ordinance is content-neutral (with the appropriate provisions severed), and as such, the Court finds that the time, place and manner regulations contained therein are reasonable and narrowly tailored to advance the substantial and carefully enumerated government interests set forth in § 3–1802 of Clearwater's Code. It does not impermissibly favor commercial speech over noncommercial speech. Additionally, Plaintiff's conclusory example fails to take into account that private residences are given ample alternatives to express their viewpoint (to "Save the Whales") by a window sign (up to eight square feet in size), a temporary yard sign, or a flag. The Court finds that the Code does not violate the equal protection clause.

Further, Clearwater's ordinance makes no specific distinction between commercial and non-commercial speech. The only provision that makes a commercial speech distinction is set forth in § 3–1803.S which

prohibits signs that are "carried, waved or otherwise displayed" in public rights-of-way or "in a manner visible from public rights-of-way." This provision contains additional guidance by providing that the prohibition is "directed toward such displays intended to draw attention for a *commercial purpose,* and is not intended to limit the display of placards, banners, flags or other signage by persons demonstrating in demonstrations, political rallies or similar events." The Court finds this restriction is content or viewpoint-neutral and is justified by Clearwater's stated interests in safety and aesthetics. Moreover, the additional guidance provided in the provision assures that government officials are not given unbridled discretion. And, just because public property can be used as a "vehicle for communication" does not mean that the Constitution requires such uses to be permitted. *See Taxpayers for Vincent,* 466 U.S. at 814–15, 104 S.Ct. 2118. Thus, in light of the viewpoint-neutrality of the ordinance, the additional guidance provided and the alternative channels of communication available for expression, the Court finds this section of the ordinance is valid.

## C. *Fifth Amendment Claim*

The Court agrees with Defendants for the reasons set forth in their motion that Plaintiff's Fifth Amendment claim is not ripe. (Dkt. # 42 at 44).

## D. *Damages*

In light of its ruling herein, the Court does not reach the issue of damages or whether Plaintiff has any vested rights in the denials of its permit applications.

## III. *CONCLUSION*

It is therefore **ORDERED AND ADJUDGED** for the reasons set forth herein that:

1. Individual Defendants' Motion to Dismiss the Complaint (and Amended Complaint) with Prejudice (Dkts.# 10, 62) are **GRANTED with prejudice.** Any attempt at amendment as to these Defendants would be futile in light of the Court's ruling herein.

2. Plaintiff's Motion for Preliminary Injunction (Dkt.# 16) is **DENIED.** As more fully set forth herein, the Court finds that Plaintiff has failed to establish the requisite elements for a preliminary injunction. *See Tefel v. Reno,* 180 F.3d 1286, 1295 (11th Cir.1999).

3. Plaintiff's Motion for Partial Summary Judgment (Dkt.# 18) is **DENIED** as specifically set forth herein.

4. Defendants' Motion for Final Summary Judgment (Dkt.# 41) is **GRANTED** as specifically set forth herein.

5. The Clerk is directed to close this case and enter judgment against Plaintiff.

# Appendix 1

DEVELOPMENT STANDARDS

I hereby certify that this is a true and correct copy of the original as it appears in the files of the City of Clearwater. Witness my hand and official seal of the City of Clearwater. This ___ day of _____ , 20___3-1801

Deputy City Clerk

D. *Minimum separation, or setback, distances:*

1. No recreational vehicle shall be located closer than ten feet to any other recreational vehicle or closer than 40 feet to any street right-of-way.

2. Minimum vehicle site area: 2,000 square feet.

3. Minimum vehicle site width: 25 feet.

4. Minimum vehicle site depth: 40 feet.

### DIVISION 17. SIDEWALKS

### Section 3-1701. Sidewalks required: new construction and major alterations or additions.

A. *Generally.* To provide protection from traffic and other similar dangers, to provide areas which can be used by pedestrian traffic and to promote the general welfare and safety of the public, all development that abuts a public right-of-way shall provide a sidewalk or sidewalks constructed on, across or adjacent thereto as provided in this division.

B. *Plan considerations.* Except as provided in subsection E hereof, in order to secure a building permit to erect a structure on vacant land, remodel an existing structure where such remodeling will exceed by 50 percent the assessed valuation of the property, or add an additional building or structure to land where a building or structure already exists and where the value of such additional building or structure will exceed by 50 percent the assessed valuation of the property, where a sidewalk does not exist, an applicant for development approval shall provide for construction of a sidewalk either in an easement where the property is abutting the public right-of-way, or upon such right-of-way. The building official, when reviewing the building plans and specifications, shall coordinate with the city engineer to insure that the plans meet all city sidewalk construction specifications and provide desirable, convenient and safe pedestrian routes.

C. *Specifications and construction.* The design, materials, width and location of sidewalks shall be in accordance with city standards as established by the city engineer.

D. *Schedule of completion.* Sidewalk construction shall be required to be completed at the property owner's expense before the building official may issue a certificate of occupancy for any building or structure for which sidewalks are required.

E. *Exceptions.* The community development coordinator may grant an exception under one of the following conditions:

1. If the natural topographical conditions; existing ditches, tree location, inadequate right-of-way or other similar physical conditions peculiar to the premises exist to prevent the reasonable construction of a sidewalk, or

2. The property owner can demonstrate that the subject property would have the only sidewalk within 200 feet of the property on the streets which the property abuts, and that such sidewalk would not form a part of a route leading to a school or public park, and that the absence of a sidewalk would not create an imminent pedestrian hazard by reason of the proximity of the property to motor vehicle traffic.

3. If the property owner qualifies for an exception, the property owner shall pay a fee in lieu of constructing the sidewalk to be used to construct a sidewalk at a future date. The fee will consist of the cost of the sidewalk construction which is excepted as indicated in the city's most recent contract for sidewalk construction plus ten percent for handling and record keeping.

### DIVISION 18. SIGNS

### Section 3-1801. General principles.

The city is a resort community on the west coast of the state with more than five miles of beaches on the Gulf of Mexico. This city has an economic base which relies heavily on tourism. In

order to preserve the city as a desirable community in which to live, vacation and do business, a pleasing, visually attractive urban environment is of foremost importance. The regulation of signs within the city is a highly contributive means by which to achieve this desired end. These sign regulations are prepared with the intent of enhancing the urban environment and promoting the continued well-being of the city.

### Section 3-1802. Purpose.

It is the purpose of this division to promote the public health, safety and general welfare through a comprehensive system of reasonable, consistent and nondiscriminatory sign standards and requirements. These sign regulations are intended to:

A. Enable the identification of places of residence and business.

B. Allow for the communication of information necessary for the conduct of commerce.

C. Lessen hazardous situations, confusion and visual clutter caused by proliferation, improper placement, illumination, animation and excessive height, area and bulk of signs which compete for the attention of pedestrian and vehicular traffic.

D. Enhance the attractiveness and economic well-being of the city as a place to live, vacation and conduct business.

E. Protect the public from the dangers of unsafe signs.

F. Permit signs that are compatible with their surroundings and aid orientation, and preclude placement of signs in a manner that conceals or obstructs adjacent land uses or signs.

G. Encourage signs that are appropriate to the zoning district in which they are located and consistent with the category of use to which they pertain.

H. Curtail the size and number of signs and sign messages to the minimum reasonably necessary to identify a residential or business location and the nature of any such business.

I. Establish sign size in relationship to the scale of the lot and building on which the sign is to be placed or to which it pertains.

J. Preclude signs from conflicting with the principal permitted use of the site or adjoining sites.

K. Regulate signs in a manner so as to not interfere with, obstruct vision of or distract motorists, bicyclists or pedestrians.

L. Require signs to be constructed, installed and maintained in a safe and satisfactory manner.

M. Preserve and enhance the natural and scenic characteristics of this waterfront resort community.

### Section 3-1803. Prohibited signs.

The following types of signs are prohibited:

A. *Abandoned signs.* Abandoned signs and/or sign structures which are determined to be nonconforming with the provisions of this division shall be required to be removed by the property owner within 30 days after receipt of notification, or refusal to accept delivery of notification by certified mail, that such removal is required. Alternatively, the sign panels within the abandoned sign structure may be removed and replaced with sign panels of neutral color and containing no message.

B. Balloons, cold air inflatable, streamers, and pennants, except where allowed as governmental and public purpose signs for special events of limited time and frequency, as approved by the city manager or the city commission.

C. Bench signs, other than the identification of the transit company or its route schedule.

D. Except as provided in section 3-1806(B)(4), changeable message signs, except menu and time and temperature signs, on which the message changes more rapidly than once every six hours.

E. Menu signs on which the message changes more rapidly than once every three hours.

F. Pavement markings, except official traffic-control markings and street addresses.

G. Portable signs.

H. Roof and above roof signs.

I. Sandwich board signs, except in the Downtown District.

J. Signs attached to or painted on piers or seawalls, other than official regulatory or warning signs.

K. Signs in or upon any river, bay, lake, or other body of water.

L. Signs located on publicly owned land or easements or inside street rights-of-way, except signs required or erected by permission of the city manger or city commission, signs or transit shelters erected pursuant to section 3-2203, and sandwich board signs to the extent permitted in the downtown district. Prohibited signs shall include but shall not be limited to handbills, posters, advertisements, or notices that are attached in any way upon lampposts, telephone poles, utility poles, bridges, and sidewalks.

M. Signs that emit sound, vapor, smoke, odor, particles, or gaseous matter.

N. Signs that have unshielded illuminating devices or which reflect lighting onto public rights-of-way thereby creating a potential traffic or pedestrian hazard.

O. Signs that move, revolve, twirl, rotate, flash, including animated signs, multiprism signs, floodlights and beacon lights except when required by the Federal Aviation Agency or other governmental agency.

P. Signs that obstruct, conceal, hide, or otherwise obscure from view any official traffic or government sign, signal, or device.

Q. Signs that present a potential traffic or pedestrian hazard, including signs which obstruct visibility.

R. Signs attached to or placed on any tree or other vegetation.

S. Signs carried, waved or otherwise displayed by persons either on public rights-of-way or in a manner visible from public rights-of-way. This provision is directed toward such displays intended to draw attention for a commercial purpose, and is not intended to limit the display of placards, banners, flags or other signage by persons participating in demonstrations, political rallies and similar events.

T. Snipe signs.

U. Temporary window signs in residential districts.

V. Three-dimensional objects that are used as signs.

W. Time and temperature signs in which the message changes more rapidly than once every 15 seconds.

X. Vehicle signs, and portable trailer signs.

Y. Any sign that is not specifically described or enumerated as permitted within the specific zoning district classifications in this development code.

(Ord. No. 6526-00, § 1, 6-15-00)

**Section 3-1804. General standards.**

A. *Setback.* No sign shall be located within five feet of a property line of a parcel proposed for development.

B. *Neon signs and lighting.* Neon signs and lighting shall be permitted as freestanding and attached signage as provided in this division. When neon lighting is utilized to emphasize the architectural features of a building, such as when used to outline doorways, windows, facades, or architectural detailing, or when used to accentuate site landscaping, it shall not be regarded as signage. In addition, neon lighting used as freestanding designs or murals or as attached murals or designs unrelated to the architectural features of the building to which the lighting is attached shall be permitted, but shall be counted toward the allowable area of the property's or occupancy's freestanding or attached signage, as applicable.

C. *Illuminated signs.*

1. The light from any illuminated sign shall be shaded, shielded, or directed away from adjoining street rights-of-way and properties.

2. No sign shall have blinking, flashing, or fluttering lights or other illumination devices which have a changing light intensity, brightness, color, or direction.

3. No colored lights shall be used at any location or in any manner so as to be confused with or construed as traffic-control devices.

4. Neither the direct nor the reflected light from primary light sources shall create a traffic hazard to operators of motor vehicles on public thoroughfares.

5. The light which illuminates a sign shall be shaded, shielded, or directed so that no structure, including sign supports or awnings, are illuminated by such lighting.

D. *Banners and flags.* A banner or flag may be used as a permitted freestanding or attached sign and, if so used, the area of the banner or flag shall be included in, and limited by, the computation of allowable area for freestanding or attached signs on the property.

E. *Gasoline price signs.* Gasoline price display signs shall be allowed in all non-residential districts except where specifically prohibited. Gasoline price display signs shall be placed in the vicinity of the pump islands and shall not extend above any pump island canopy or they shall be attached to the primary freestanding sign for the property. If attached to the freestanding sign, the area of the gasoline price display sign shall be counted toward the allowable area for the freestanding sign.

F. *Time and temperature.* Time and temperature signs shall be allowed in all non-residential districts. The maximum area for the time and temperature portion only shall be 20 square feet. The area of a time and temperature sign, whether attached or freestanding, shall be included in determining the cumulative area of signs on a property.

G. *Building and electrical code compliance.* All signs shall comply with applicable building and electrical code requirements.

H. Notwithstanding any other provision of this Code, no sign shall be subject to any limitation based on the content of the message contained on such sign.
(Ord. No. 6526-00, § 1, 6-15-00; Ord. No. 6595-00, § 7, 9-7-00)

### Section 3-1805. Signs permitted without a permit.

The following signs may be developed without development review pursuant to Article 4 of this development code:

A. One address sign of no more than two square feet of total sign face area for each parcel of land used for residential purposes and no more than three square feet of total sign face area for each parcel of land used for commercial purposes.

B. Art work and/or architectural detail.

C. Temporary signs.

1. One temporary grand opening sign shall be permitted for 30 days after the issuance of an occupational license for any new business, new owner of an existing business, or business name change. Such sign shall not exceed 12 square feet in total sign face area or such sign may be a temporary covering, such as a toaster cover, sign boot, or sign sock, which covers an existing permitted attached or freestanding sign.

2. Other temporary special event and/or public purpose signs of a temporary nature may be approved on a case by case basis. The type of sign, size, design and length of display shall be determined by the community development coordinator.

D. Holiday decorations.

E. A single sign indicating a valet parking station no more than four square feet visible only during hours that the valet is operating.

F. One construction sign located on a parcel proposed for development during the period a building permit is in force or one year, whichever is less, which sign shall not exceed:

1. Sixteen square feet of total sign face area for parcels of land used or proposed to be used for residential purposes;

2. Twenty-four square feet of total sign face area for parcels of land used or proposed to be used for multifamily or non-residential purposes.

G. One flag per detached dwelling unit, three additional flags per parcel of land used for multifamily residential purposes, and three flags per parcel of land used for non-residential purposes.

H. One garage and yard sale sign of no more than four square feet of total sign face area located on the parcel of land where the garage or yard sale is to be conducted only on the date or dates on which the garage or yard sale is conducted. In addition, no more than two directional signs of no more than four square feet of total sign face area per sign related to a garage or yard sale which are located on privately owned parcels of land other than the parcel of land where the garage or yard sale is to be conducted only on the date or dates on which the garage or yard sale is conducted.

I. Signs which are integral and incidental to equipment, or machinery and cover not more than 20 percent of the exterior surface of such equipment, facilities or machinery.

J. Attached menu signs of no more than four square feet of sign face area located at the entrance or service window of a restaurant. One freestanding drive-through sign no more than 16 square feet in area and six feet in height located in the rear of the principal building.

K. Onsite directional and traffic control signs of no more than four square feet of sign face area provided that business logos or other non-traffic control symbols do not exceed 25 percent of the sign face area.

L. Signs identifying parking space numbers provided that such signs are painted on the paved surface of each space or do not exceed one-half square foot of sign face area per sign.

M. Signs identifying marina slip numbers provided that such signs are painted on the dock in front of each slip or do not exceed one square feet of sign face area per sign.

N. Temporary yard signs.

1. One temporary yard sign shall be allowed for each political candidate or issue for each frontage per parcel of land. Such signs shall be erected no sooner than 60 days prior to the election for which they were intended, and shall be removed within seven days after the election for which they are intended. The total sign face area of each sign shall not exceed six square feet in area on parcels of land designated or used for residential purposes and 32 square feet of total sign face area on parcels of land designated or used for non-residential purposes.

2. One other temporary yard sign shall be permitted only on parcels of land designated or used for residential purposes on each road frontage per parcel of land provided that such signs are displayed no more than three times a year for a total of 90 days during a one year period, and provided that the total sign face area of each signs does not exceed six square feet.

COMMUNITY DEVELOPMENT CODE

O. One freestanding real estate sign per parcel of land indicating that a parcel of land or a building located on the parcel of land or part thereof is for sale, for lease or otherwise available for conveyance, provided that such sign does not exceed:

1. Six square feet of total sign face area on parcels of land designated or used for residential purposes, and

2. Thirty-two square feet of total sign face area on parcels of land designated or used for non-residential purposes.

In the event that more than one dwelling unit or non-residential space on a single parcel of land is for sale, for lease or otherwise available, one attached sign per dwelling or space of no more than two square feet in total sign face area in addition to the permitted freestanding signage. In addition, one freestanding waterfront sign of no more four square feet of total sign area for each waterfront parcel of land.

P. Signs located within a stadium which are not visible from outside of a stadium.

Q. Window signs up to eight square feet in area may be located on any window area provided such sign does not exceed 25 percent of the total area of the window where the sign is located. In no case shall the cumulative area of all window signs erected exceed 24 square feet in area.

R. Safety or warning signs which do not exceed four square feet of sign face area per sign.

S. A change in a sign message on a previously approved, lawful sign.

T. One sign identifying each individual vessel slip at a marina provided such sign does not exceed four square feet in area and is placed in the vicinity of the slip. For commercial marinas having separately licensed slips for commercial vessels, each licensed slip shall be permitted one sign containing not more than eight square feet in area placed in the vicinity of the slip to identify the vessel, rate/embarking schedules, or other information. Such sign shall be in addition to marina vessel signs.

(Ord. No. 6526-00, § 1, 6-15-00; Ord. No. 6573-00, §§ 3, 4, 8-3-00; Ord. No. 6595-00, § 8, 9-7-00)

Section 3-1806. Permitted signs requiring development review.

A. *Residential.* The following signs shall be permitted in all residential zoning districts:

1. *Freestanding subdivision development entry signs.*

a. One freestanding entry sign for each entrance into a platted subdivision of no more than 24 square feet of total sign face per sign.

b. The height of a freestanding sign shall not exceed six feet.

2. *Freestanding multifamily entry sign.*

a. One freestanding identity sign per entrance into a multifamily development of no more than 12 square feet of total sign face per sign.

b. The height of a freestanding sign shall not exceed six feet.

c. A freestanding identity sign shall include the address of the property on which the sign is to be located.

3. *School and park identification monument signs.*

a. One monument entry sign for each major entry into a school or a park of no more than 20 square feet of total sign face per sign.

b. The height of a monument sign shall not exceed five feet.

c. All monument signs shall be installed in a landscaped area of not less than 12 square feet and shall include the address of the property on which the sign is to be located.

B. *Non-residential.*

1. *Freestanding signs.* The following signs shall be permitted in all non-residential zoning districts other than the Tourist District and the Downtown District:

 a. One freestanding sign per parcel proposed for development with no more than two sign faces. A parcel located at a corner may be permitted two signs, one on each street frontage, provided that the maximum area of the sign faces of the two signs shall not exceed the total maximum allowable area.

 b. All freestanding signs shall be setback at least five feet from the property lines of the parcel proposed for development.

 c. The area of a freestanding sign face shall not exceed:

 i. One square foot per two linear feet of street frontage;

 ii. One square foot per 100 square feet of building facade facing street frontage; or

 iii. Sixty-four square feet; whichever is less. However, a minimum of ten square feet per parcel proposed for development shall be allowed.

 d. The total area of all sign faces on a freestanding sign shall not exceed 128 square feet per parcel proposed for development.

 e. The height of a freestanding sign shall not exceed one and one-half times the width of the sign structure or 14 feet whichever is less.

 f. All freestanding sign structures shall be installed in a landscaped area of not less than 12 square feet and shall include the address of the property on which the sign is to be located.

 g. A monument sign, not exceeding the area of a permitted freestanding sign by more than 25 percent, shall be permitted in lieu of a freestanding sign. Such sign shall not exceed six feet in height, shall be located at least five feet from a property line and shall be placed in a landscaped setting no less than 12 square feet in area.

2. *Monument signs.* Monument signs shall be permitted in the Tourist District and Downtown District as follows:

 a. One monument sign per parcel proposed for development with no more than two sign faces. A parcel located at a corner may be permitted two signs, one on each street frontage, provided that the maximum area of the sign faces of the two signs shall not exceed the total maximum allowable area.

 b. All monument signs shall be setback at least five feet from the property lines.

 c. The area of a monument sign face shall not exceed:

 i. One square foot per two linear feet of street frontage;

 ii. One square foot per 100 square feet of building facade facing street frontage; or

 iii. Twenty square feet, whichever is less. However, a minimum of ten square feet per parcel proposed for development shall be allowed.

 d. The total area of all sign faces on a monument sign shall not exceed 40 square feet per parcel proposed for development.

 e. The height of a monument sign shall not exceed four feet.

 f. All monument sign structures shall be installed in a landscaped area of not less than 12 square feet.

3. *Attached signs.* The following signs shall be permitted in all non-residential districts:

 a. One attached sign per business establishment. The area of an attached sign face shall not exceed:

 i. One square foot per 100 square feet of building facade facing the street frontage; or

 ii. Twenty-four square feet; whichever is less. However, a minimum of ten square feet per business establishment with a principal exterior entrance shall be allowed.

 b. Where individual building establishments are located in a single building or in multiple buildings which are attached, attached signs shall be designed according to a common theme but be sufficiently different in style, color, materials or other characteristic to avoid a sense of uniformity or sameness.

4. *Transit and shelter signs.* Signs are permitted on transit shelters approved in accordance with Article 3 Division 22 of this Development Code, subject to the following restrictions:

 a. The advertising contained in the transit shelter shall be limited to the "downstream" end wall (furthest from approaching transit vehicles) for a two-sided or flared and secured panel.

 b. Lighting of advertising materials shall be limited to back-lighting.

 c. No advertising poster shall exceed 24 square feet in area, or be greater than six feet in height and four feet in width.

 d. The total number of transit shelters containing advertising shall not exceed 50 within the Clearwater planning area provided in the interlocal agreement between the city and county in effect as of January 14, 1992.

5. Changeable copy signs provided located on public property serving a significant public purpose.

6. *Nonconforming uses.* Any nonconforming use, which would be entitled to a sign if it were conforming, shall be permitted to erect the maximum amount of allowable signage in the district in which the use is located.

(Ord. No. 6417-99, § 11, 8-19-99; Ord. No. 6526-00, § 1, 6-15-00)

## Section 3-1807. Comprehensive sign program.

A. *General principles.*

1. The intent of the comprehensive sign program is to provide private property owners and businesses with flexibility to develop innovative, creative and effective signage and to improve the aesthetics of the City of Clearwater.

2. The minimum sign standards established in this division ensure that signage will not have an adverse impact on the aesthetics, community character and quality of life of the City of Clearwater. The city recognizes, however, that in many circumstances, there are innovative and creative alternatives to minimum standard signage which are desirable and attractive and will enhance community character and individual property values.

3. The purpose of the comprehensive sign program is to provide an alternative to minimum standard signage subject to flexibility criteria which ensure that alternative signage will not have an adverse impact on the aesthetics, community character and quality of life of the City of Clearwater.

B. *Permitted signage.* Signage which is proposed as part of a comprehensive sign program may deviate from the minimum sign standards in terms of numbers of signs per business or parcel of land, maximum area of a sign face per parcel of land and the total area of sign faces per business or parcel of land, subject to compliance with the

flexibility criteria set out in Section 3-1807(C). Monument signs, permitted pursuant to Section 3- 1806(B)(1)(g) and Section 3-1806(B)(2) shall not be eligible for comprehensive sign program. A comprehensive sign program shall be approved as part of a level one or level two approval, as the case may be.

 C. *Flexibility criteria.*

 1. *Architectural theme.*

 a. The signs proposed in a comprehensive sign program shall be designed as a part of the architectural theme of the principal buildings proposed or developed on the parcel proposed for development and shall be constructed of materials and colors which reflect an integrated architectural vocabulary for the parcel proposed for development; or

 b. The design, character, location and/or materials of the signs proposed in a comprehensive sign program shall be demonstrably more attractive than signs otherwise permitted on the parcel proposed for development under the minimum sign standards.

 2. *Height.* The maximum height of all signs proposed in a comprehensive sign program is 14 feet provided however that a single attached sign with a sign face of no more than 12 square feet may be erected up to the height of the principal building.

 3. *Lighting.* Any lighting proposed as a part of a comprehensive sign program is automatically controlled so that the lighting is turned off at midnight or when the business is closed.

 4. *Total area of sign faces.* The total area of sign faces which are proposed as a part of a comprehensive sign program shall not exceed two times the total area of sign faces permitted under the minimum sign standards on the parcel proposed for development.

 5. *Community character.* The signage proposed in a comprehensive sign program shall not have an adverse impact on the community character of the City of Clearwater.

 6. *Property values.* The signage proposed in a comprehensive sign program will not have an adverse impact on the value of property in the immediate vicinity of the parcel proposed for development.

 7. *Elimination of unattractive signage.* The signage proposed in a comprehensive sign program will result in the elimination of existing unattractive signage or will result in an improvement to the appearance of the parcel proposed for development in comparison to signs otherwise permitted under the minimum sign standards.

 8. *Special area or scenic corridor plan.* The signage proposed in a comprehensive sign program is consistent with any special area or scenic corridor plan which the City of Clearwater has prepared and adopted for the area in which the parcel proposed for development is located.

(Ord. No. 6417-99, § 11, 8-19-99; Ord. No. 6526-00, § 1, 6-15-00; Ord. No. 6595-00, § 8, 9-7-00)

### DIVISION 19. SUBDIVISION DESIGN STANDARDS

**Section 3-1901. General principles.**

A. The principles and standards contained in this division shall guide the city in the review of proposed subdivision and condominium plats.

B. Land with features which may present a hazard to the safety of present or future inhabitants of the area to be platted or of adjacent property shall not be developed unless adequate methods are formulated by the applicant, and approved by the city, to solve the problems created by such unsuitable land conditions.

C. Land which cannot be provided with adequate streets, water supply, sanitary sewer service, storm drainage facilities or other essential public services shall not be platted for purposes which require such services.

# Appendix 2

## ARTICLE 4. DEVELOPMENT REVIEW AND OTHER PROCEDURES

Division 1. Required Permits and Approvals

Division 2. General Procedures

Sec. 4-201. Optional pre-application conference.
Sec. 4-202. Applications for development approval.
Sec. 4-203. Building permit.
Sec. 4-204. Occupancy permit.
Sec. 4-205. Occupational license.
Sec. 4-206. Notices and public hearings.

Division 3. Permitted Uses: Level One

Sec. 4-301. Purpose and applicability.
Sec. 4-302. Application/approval by community development coordinator.
Sec. 4-303. Effect of level one approval.

Division 4. Permitted Uses: Level Two

Sec. 4-401. Purpose and applicability.
Sec. 4-402. Application.
Sec. 4-403. Staff review, report and recommendation.
Sec. 4-404. Community development board decision.
Sec. 4-405. Effect of decision.
Sec. 4-406. Changes to level two development approvals.
Sec. 4-407. Expiration of approval.

Division 5. Appeals

Sec. 4-501. Authority and purpose.
Sec. 4-502. Application/notice of appeal.
Sec. 4-503. Staff review, report and recommendation.
Sec. 4-504. Community development board appeals.
Sec. 4-505. Hearing officer appeals.

Division 6. Level Three Approvals

Sec. 4-601. Text amendments.
Sec. 4-602. Zoning atlas amendments.
Sec. 4-603. Comprehensive plan amendments.
Sec. 4-604. Annexation.
Sec. 4-605. Developments of regional impact.
Sec. 4-606. Development agreements.
Sec. 4-607. Historic designation.
Sec. 4-608. Neighborhood conservation overlay district.
Sec. 4-609. Vested rights.

Division 7. Subdivisions/Plats

Sec. 4-701. Purpose and applicability.
Sec. 4-702. Required approvals.
Sec. 4-703. Application requirements.
Sec. 4-704. Staff review and report/decision.
Sec. 4-705. Community development board decision.
Sec. 4-706. Final plat review/staff.
Sec. 4-707. City commission review/decision/final plat.
Sec. 4-708. Recording of final plat.

I hereby certify that this is a true and correct copy of the original as it appears in the files of the City of Clearwater. Witness my hand and official seal of the City of Clearwater.
This ___ day of _____, 20__

_____
Deputy City Clerk

COMMUNITY DEVELOPMENT CODE

Sec. 4-709. Standards for review.

Division 8. Traffic Impact Study

Sec. 4-801. Purpose and applicability.
Sec. 4-802. Procedures.
Sec. 4-803. Standards for study.

Division 9. Concurrency Management

Sec. 4-901. Authority and applicability.
Sec. 4-902. Application and procedures.
Sec. 4-903. Standards for certificate of concurrency/capacity.

Division 10. Sign Permit

Sec. 4-1001. Purpose.
Sec. 4-1002. Permit required.
Sec. 4-1003. Application.
Sec. 4-1004. Procedures.
Sec. 4-1005. Expiration.
Sec. 4-1006. Identification.
Sec. 4-1007. Inspections.

Division 11. Landscaping Plan

Sec. 4-1101. Landscaping required.
Sec. 4-1102. Plan requirements.

Division 12. Tree Removal Permit

Sec. 4-1201. Permit required.
Sec. 4-1202. Removal permit—Application.
Sec. 4-1203. Appeal from denial of removal permit.
Sec. 4-1204. Removal permit—Term, expiration.
Sec. 4-1205. "No tree" statement; "no tree removal permit required" state-
 ment.

Division 13. Land Clearing and Grubbing

Sec. 4-1301. Permit required.
Sec. 4-1302. Application/appeal.
Sec. 4-1303. Criteria for issuance.

Division 14. Transfer of Development Rights

Sec. 4-1401. Purpose and authority.
Sec. 4-1402. Allocated development rights are freely transferable..
Sec. 4-1403. Use of transferred development rights.

Division 15. Adult Use Permits

Sec. 4-1501. Permit required; classification of permits.
Sec. 4-1502. Permit application.
Sec. 4-1503. Transfer of permit.
Sec. 4-1504. Changing name of establishment.
Sec. 4-1505. Conflicting applications.

DEVELOPMENT REVIEW AND OTHER PROCEDURES

Division 16. Unity of Title Declaration

Sec. 4-1601. Unity of title.

DIVISION 1. REQUIRED PERMITS AND APPROVALS

This Development Code establishes the following types of development approvals: Level one, level two, and level three. Level one approvals involve those development proposals which are reviewed and approved by the city's professional staff. Level two approvals are those development proposals which are more complex and involve the use of greater discretion by an appointed board accountable, through the appointment process, to the city commission. Level three approvals are those approvals which state law requires action by the city commission because they involve issues of public policy in the first instance. The following graphic portrays this concept of different levels of approval:

# DEVELOPMENT REVIEW

The divisions in this article establish the requirements for each type of approval beginning with general procedures which are applicable to all three levels of approval and a graphic (flow chart) describing the process for each type of approval.

## DIVISION 2. GENERAL PROCEDURES

### Section 4-201. Optional pre-application conference.

An applicant for development approval may request an informal conference with the community development coordinator prior to filing an application for the purpose of discussing the proposed development and to identify the views and concerns of the applicant and the city's professional staff.

### Section 4-202. Applications for development approval.

A. *Basic information required for all applications.* Except as provided in subsection 23 for fence permits, or unless otherwise inapplicable for the permit sought, all applications for development approval shall include the following information:

1. The applicant's name, signature, mailing address, and telephone and facsimile, if any, number.

2. The name and signature of all legal and equitable owners of the parcel proposed for development, if different from the applicant. Notwithstanding the foregoing, the application need not be signed by the owner where the applicant is an entity

having the power of eminent domain and the entity has authorized the acquisition of the subject property by eminent domain. In such cases, the application will be conditionally accepted and any approval will be conditioned upon the entity obtaining title within a specific period of time not to exceed two years.

3. The name of the owner(s) representative and consultants, if any.

4. Street address of the parcel proposed for development.

5. Ownership: A copy of a deed to the property proposed for development, a copy of a title insurance policy or an affidavit attesting to ownership.

6. A legal description of the property which is the subject of the application.

7. A plat of record or sealed survey of the property including the dimensions, acreage and location of the property prepared by a registered land surveyor.

8. The existing zoning and land use plan classification for the property and for the properties contiguous to the parcel proposed for development.

9. If the proposed development is for a single-family dwelling or accessory use, a plot plan with the following information:

 a. Existing and proposed parking areas, sidewalks and driveways.

 b. Existing and proposed locations, setbacks, uses, and gross floor area of building and structures.

 c. Existing and proposed height of all buildings and structures.

 d. Existing and proposed fences and landscaping.

 e. Existing and proposed utilities, including water, sewer, gas, and stormwater.

 f. A tree survey showing the location and species of all existing trees located on the parcel proposed for development with a DBH of four inches or more.

 g. Existing utility easements, including Official Records book and page numbers, and any proposed utility easements.

 h. All prior approval conditions, or subdivision platting conditions, unless waived by the Community Development Coordinator at a pre-application conference.

 i. Elevation drawings where the applicant is seeking approval of a residential infill project, unless waived by the community development coordinator.

10. If the proposed development is for a home occupation, an executed affidavit:

 a. Agreeing to comply with all standards contained in Article 3 Division 2 and any other conditions of the home occupation that may be established in authorizing same.

 b. Recognizing the need to renew the requisite occupational license annually or as may otherwise be required.

 c. Acknowledge that any departure from the conditions authorizing the use shall be grounds for the revocation of the applicable occupational license.

 d. Agreeing to permit reasonable inspection of the premises of the home occupation to ensure compliance with the conditions thereof.

11. For all other development, a site plan drawn to a minimum scale of one inch equals 50 feet on an overall sheet size not to exceed 24 inches by 36 inches. When more than one sheet is required, an index sheet of the same size shall be included showing the entire parcel with individual sheet numbers referenced thereon and including the following:

 a. North arrow, scale and date prepared.

b. Location map.

c. Identification of watercourses, wetlands, tree masses and specimen trees, including description and location of understory, ground cover vegetation and wildlife habitats or other environmentally unique areas.

d. Land areas expressed in square feet and acres.

e. The number of dwelling units proposed, if any.

f. Gross floor area devoted to each use.

g. The footprint of all buildings and structures and all required setbacks, including required sight triangles.

h. The location, type and lamp height of all outdoor lighting fixtures.

i. Location of all public and private easements and street rights of way within and adjacent to the site.

j. Location of all existing and proposed points of access.

k. The location, size and height of all existing and proposed buildings and structures on the site.

l. The location of existing public and private utilities.

m. Number of parking spaces provided, presented in tabular form with the number of required spaces.

n. Total paved vehicular use area, including but not limited to all paved parking spaces and driveways, expressed in square feet and as a percentage of the area of the overall site.

o. Depiction by shading or crosshatching of required parking lot interior landscape areas.

p. Total land area devoted to parking lot interior landscaping, expressed in square feet and as a percentage of the paved vehicular area.

q. Location of all refuse collection facilities and all required screening.

r. Tree survey showing the location, DBH and species of all existing trees with a DBH of four inches or more and identifying those trees proposed to be removed.

s. The location of all proposed landscape material including size and species.

t. The location of onsite and offsite storm-water management facilities.

u. Existing and proposed utilities, including size and location of all water lines, fire hydrants, sewer lines, manholes and lift stations.

v. Existing utility easements, including official records book and page numbers, and proposed utilities easements.

w. Off-site elevations, as may be required by the engineering department, to evaluate proposed stormwater management for the parcel proposed for development.

x. Elevation drawings where the applicant is seeking approval of a residential infill project or a comprehensive infill redevelopment project, unless waived by the community development coordinator.

12. If the property proposed for development exceeds one acre, the site plan shall include, in addition to the items in subsection 11 above:

a. Existing one-foot contours or spot elevations on the site, and such offsite elevations as may be required to evaluate proposed stormwater management for the parcel proposed for development.

b. The location and character of a proposed use of land within the parcel proposed for development, including all recreational and open space areas, plazas and major landscaped areas by function, and the general

§ 4-202 COMMUNITY DEVELOPMENT CODE

location and description of all proposed outdoor furnishings, such as seating, and telephones.

c. The location of all earth or water retaining walls, earth berms, and public and private sidewalks.

d. Identification of the boundaries of phases, if development is proposed to be constructed in phases.

e. Dimensions of lot lines, streets, drives, building lines, building setbacks, building heights, structural overhangs, and building separations.

f. Tree inventory, prepared by a certified arborist, of all trees eight inches DBH or more reflecting the size, canopy, and condition of such trees.

13. A preliminary plat if one is required in Article 4 Division 7.

14. A traffic impact study if one is required in Article 4 Division 8.

15. An application for a certificate of concurrency/capacity if one is required in Article 4 Division 9 or a non-concurrency affidavit.

16. A sign plan if one is required in Article 4 Division 10.

17. A landscaping plan if one is required in Article 4 Division 11.

18. A tree removal application if one is required in Article 4 Division 12 or a "no tree" statement or a "no tree removal permit required" statement.

19. A grading and erosion control plan along with a clearing and grubbing application as required in Article 4, Division 13.

20. If applicable, a parking lot plan be drawn to an accurate scale, identify the property, and shall delineate lot entrances and exits, distance from property lines, grading for drainage, lighting, planting areas, traffic signs/markings, type of surfacing, curbs, and any additional information particular to the site which the city determines necessary to facilitate review of the plan.

21. If the property is located within an area of special flood hazard, the information required by Chapter 51 of the City's Code.

22. In the event the application involves the use of transferable development rights, the information required by Section 4-1403 of this Development Code.

23. In the event the application involves development where design standards are an issue, such as in the Tourist and Downtown Districts, or where the applicant is seeking approval of a residential infill project, comprehensive redevelopment project, comprehensive sign program or comprehensive landscaping plan, the applicant shall submit proposed elevation drawings.

24. An application for a permit for a seawall, bulkhead, groin, marina, dock, bridge or other similar marine structure shall be accompanied by detailed plans and specifications, prepared by a Florida professional engineer, bearing the seal and signature of the engineer, except signed and sealed plans shall not be required for the repair or replacement of decking, stringers, railing, lower landings, tie piles, or the patching or reinforcing of existing piling on private and commercial docks for which a city permit was originally issued. Prior to commencing construction or repair or replacement of any dock, pier or wharf, the applicant shall present to the building official evidence that the person who will carry out the proposed work holds a certificate of competency issued by Pinellas County.

25. An application for a fence permit shall include the following:

a. The applicant's name, mailing address, and telephone and facsimile, if any, number.

b. The name of all legal and equitable owners of the parcel proposed for development, if different from the applicant.

 c. Street address of the parcel proposed for development.

 d. If the proposed development is for a single-family dwelling or accessory use, a plot plan with the following information:

 i. Existing and proposed fences and landscaping.

 ii. The proposed height and materials of the proposed fence.

B. *Simultaneous applications.* If more than one approval is required (for example, level one and level three) for a particular development proposal, with the exception of an application for a building permit, certificate of occupancy or occupational license, an applicant is required to submit all applications for development approval at the same time.

C. *Determination of completeness / sufficiency.*

 1. *Determination of completeness.* Within five working days after receipt of an application for development approval, the community development coordinator shall determine whether the application is complete.

 a. *Application complete.* If the community development coordinator determines that the application is complete, he shall notify the applicant in writing that the application has been accepted for filing.

 b. *Notice to abutting property owners.* When the community development coordinator has accepted an application for level one approval (flexible standard development) for filing, he shall immediately notify the owners of the property within 200 feet of the property, excluding any water bodies within that distance, which is the subject of the application and any affected neighborhood association and any citywide neighborhood association in writing that an application has been filed, the nature of the approval requested and the proce-dure for consideration of the application, as well as the right of the owner to appeal a decision.

 c. *Application not complete.* If the community development coordinator determines that the application is not complete, he shall notify the applicant, specifying the deficiencies of the application. No further development review shall be taken by the community development coordinator until the deficiencies are corrected and the application is deemed complete.

 2. *Determination of legal sufficiency:* Level one (standard development). Within five working days after a determination that a level one (standard development) application is complete, the community development coordinator shall determine whether the application is legally sufficient, that is whether the required application materials have been prepared in a substantively competent manner. If the community development coordinator determines that any portion of the application is insufficient, the community development coordinator shall notify the applicant of the reasons that the application is legally insufficient, that the application is deemed withdrawn and no further development review shall be conducted until the application is resubmitted.

 3. *Determination of legal sufficiency:* Level one (flexible standard development), level two or level three approvals. Within ten working days after a determination that the application is complete, the members of the development review committee in the case of level one (flexible standard development), level two or level three approvals shall determine whether the application is legally sufficient, that is whether the required application materials have been prepared in a substantively competent manner. If any member of the development review committee determines that any portion of the application is insufficient, the community develop-

ment coordinator shall notify the applicant of the reasons that the application is legally insufficient, that the application is deemed withdrawn and no further development review shall be conducted until the application is resubmitted.

D. *Review by development review committee.* After an application for development approval is determined to be complete and legally sufficient, the development review committee shall review the application in accordance with Division 3 of this Article if a level one approval, Division 4 if a level two approval and Division 6 if a level three approval.

E. *Issuance of development order.* The community development coordinator shall issue a development order for Level One (flexible standard) approval.

F. *Fees.* Except for those applications submitted on behalf of governmental agencies, all applications for development approval shall be accompanied by the payment of a fee established from time-to-time by the city commission and maintained as Appendix A to the City Code.

G. *Resubmission of application affecting same property.*

1. No application shall be accepted during the following time periods after the denial of a substantially similar application affecting the same property or any portion thereof:

 a. Nine months for level two approvals.

 b. Twelve months for level three approvals.

2. The time periods specified in this subsection shall be deemed to have commenced only after the completion of any administrative or judicial review which may have been sought.

(Ord. No. 6526-00, § 1, 6-15-00)

## Section 4-203. Building permit.

A. *Permit required.*

1. No person shall commence any construction, demolition, modification or renovation of a building or structure without first obtaining a building permit.

2. No seawall, bulkhead, groin, marine improvement, bridge or other similar marine structure shall be built within the city until the building official has issued a building permit for such work.

3. A building permit shall authorize only the use, arrangement and/or construction described in level one and two approvals and no other use, arrangement or construction.

4. Complete engineering and architectural plans for each component of a development project shall be required to be submitted prior to the issuance of a building permit. For any phased project, such plans shall be required for each phase of the development.

B. *Procedure:* All applications for building permits shall be submitted in a form required by this Development Code and the building official. Upon receipt of an application, including a declaration of unity of title, in accordance with Article 4 Division 16, the building official shall forward a copy to the community development coordinator in order to determine whether the application conforms to an approved level one or level two approval. Upon receipt of the determination of the community development coordinator, the building official shall determine whether the application conforms to all applicable requirements contained in the building code. If the building official determines that the application does conform, the building permit shall be issued. If the building official determines that the application does not conform, he shall identify the application's deficiencies and deny the application.

C. *Appeal:* A denial of a building permit may be appealed in the manner provided in Article 4 Division 5.

(Ord. No. 6526-00, § 1, 6-15-00)

## Section 4-204. Occupancy permit.

A. *Applicability.*

1. A certificate of occupancy shall be required for the following:

 a. *Occupancy and use of land or a building* hereafter improved, erected, structurally altered, reconstructed, enlarged or moved.

 b. Change in occupancy or use of an existing nonresidential building.

 c. Change in the use of land, building or structure.

2. No occupancy permit shall be issued unless it has been determined that the building or structure and the site complies with the provisions of the Building Code, this Development Code and prior approvals upon which the building permit was based.

B. *Procedure.*

1. All applications for occupancy permits shall be submitted in a form required by the building official.

2. In the event a valid building permit is not in effect, upon receipt of an application for the occupancy permit, the building official shall forward a copy of the application to the community development coordinator in order to determine whether the application conforms to an approved level one or level two approval. Upon receipt of the determination of the community development coordinator that the application does conform, the building official shall determine whether the application conforms to all applicable requirements contained in the building code.

3. If a valid building permit is still in effect, upon receipt of an application for an occupancy permit, the building official shall determine by inspection whether the work authorized by the building permit has been completed in accordance with the approved plans.

4. If the building official determines that the work does conform, the occupancy permit shall be issued. If the building official determines that the application does not conform, he shall identify the application's deficiencies and deny the application.

C. *Appeal.* A denial of a certificate of occupancy may be appealed in the manner provided in Article 4 Division 5.
(Ord. No. 6417-99, § 12, 8-19-99)

## Section 4-205. Occupational license.

A. *Applicability.* Any person required to obtain an occupational license in order to conduct business within the city pursuant to the provisions of Chapter 29, Article II of the city's Code, shall obtain such license after the issuance of an occupancy permit.

B. *Procedure.*

1. All applications for occupational licenses shall be prepared on forms available from the city manager.

2. Upon receipt of an application for an occupational license, the city manager shall forward a copy of the application to the community development coordinator who shall review the application to determine if the occupation conforms to applicable provisions of this development code and any prior approvals.

3. Upon receipt of a determination by the community development coordinator that the occupation does conform to applicable provisions of this development code and prior approvals, then the city manager shall review the application and determine whether the occupation conforms to all applicable requirements of Chapter 29, Article II of the city's Code.

4. Following review and determination as to conformance by both the community development coordinator and the city manager, the city manager shall either issue the occupational license or deny the application.

C. *Appeal.* A denial of an occupational license may be appealed in the manner provided in Article 4 Division 5.
(Ord. No. 6526-00, § 1, 6-15-00)

## Section 4-206. Notices and public hearings.

A. *Applicability.* The procedures set out in this section shall be applicable to all public hearings required by any provision of this development code. All public hearings shall be conducted in accordance with Florida law.

B. *Types of hearings.* There are two types of public hearings required under Florida law: quasi-judicial hearings and non-quasi-judicial or legislative hearings. All public hearings required pursuant to this Development Code, except for hearings required for amendments to the Comprehensive Plan, text amendments, development agreements and annexations, are quasi-judicial and the procedures set out in section 4-206(D) shall apply.

C. *Notice of hearings.* The city clerk is responsible for providing notices for required public hearings:

1. All notices of public hearings shall include:

 a. The date, time and place of the hearing.

 b. A summary of the proposal under consideration.

 c. The address of the property and a locational map graphically portraying the location of the property (if applicable).

 d. A contact in the city and telephone number in order to obtain further information.

2. All notices of public hearings shall be provided:

 a. By publication of a copy of the notice in one or more newspapers with general circulation in the City of Clearwater.

 b. By sending a copy of the notice by mail to each owner of record, if different from the applicant, of any land on which development is proposed.

 c. For level two approvals, by sending a copy of the notice by mail to each owner of record of any land within 200 feet of the parcel proposed for development, excluding any water body. Notice shall also be mailed to any affected registered local neighborhood association and to any citywide neighborhood association.

 d. For level three approvals, by sending a copy of the notice by mail to each owner of record of any land within 200 feet of the property on which development is proposed, excluding any water body. Notice shall also be mailed to any affected registered local neighborhood association and to any citywide neighborhood association. If more than 30 owners of property are involved, unless otherwise directed by the city commission, in lieu of mailing such notice, the clerk may publish the notice at least twice in a newspaper of general circulation.

 e. By posting a sign at least six square feet in area and not exceeding six feet in height facing the street(s) on the parcel proposed for development.

3. Unless otherwise required by Florida Statutes, all required *notices* shall be provided at least 15 but not more than 45 days in advance of the public hearing.

D. *Conduct of quasi-judicial hearing.*

1. *Staff report/recommendation.* At least five days in advance of the hearing, the community development coordinator's report and recommendation regarding the application for development approval which is the subject of the hearing shall be delivered to the community development board and the applicant, and be available to the general public.

2. *Ex parte communications and expert opinions.* Except as provided in this subsection, no member of the community development board or the city commission shall engage in any ex parte communications with any person in regard to the substance of a quasi-judicial matter which is to be considered by the board or commission, as the case may be.

 a. Members of the community development board may conduct personal investigations with regard to a quasi-judicial matter pending before them provided that the existence of such

investigation or site visit, is disclosed at a public hearing and made a part of the record before final action on the matter.

3. *Opening matters and preliminary remarks:*

a. The community development coordinator shall describe the application and identify the applicant and announce the order of presentation.

b. The chair of the community development board or the hearing officer shall inquire of those attending the hearing if there is any person who wishes to seek party status and explain that party status entitles the party to:

i. Personally testify.

ii. Present evidence by documentary submittal.

iii. Present witnesses.

iv. Conduct cross examination of any witness.

v. Present argument.

vi. Appeal the decision.

Party status shall be granted by the community development board or the hearing officer, as the case may be, if the person requesting such status demonstrates that he is a substantially affected person. Any other interested person (not a party) shall be entitled to participate in the hearing, subject to the control by the body conducting the hearing and may be requested to respond to questions from the body conducting the hearing, but need not be subject to cross-examination or qualified as an expert witness.

c. Disclosure of the substance of the subject of any ex parte communications, including the identity of the person, group, or entity with whom the communication took place and all written communications to the community development board, or the hearing officer, if any, which shall be made a part of the record.

d. The witnesses shall be sworn.

4. *Burden of proof.* The burden of proof is upon the applicant to show by substantial competent evidence that he is entitled to the approval requested.

5. *Presentation of case.* The applicant, the city and any other party may present testimony, examine witnesses, and present documentation at the public hearing and may cross-examine other witnesses. Other interested persons may present comments or argument in support of or in opposition to the application.

6. *Order/recommended order.* In the case of a level two approval or an appeal, the community development board or the hearing officer shall issue an order and, in the case of a level three approval, a recommended order, which shall include:

a. Findings of fact in regard to any questions of fact which were presented during the proceedings.

b. Conclusions of law in regard to the applicable provisions of the comprehensive plan and the community development code.

c. Approval or approval with conditions or a recommended approval or approval with conditions, in the case of a level three approval.

7. *City commission decision.*

a. In the event the city commission is required to render a final approval, such case shall be heard within six months of the community development board recommendation or the case shall be deemed to be withdrawn.

b. In the event the city commission is required to render a final approval, the record adduced before the community development board shall be presented to the city commission for

their review. The city commission may hear public comment and argument, but no additional testimony shall be allowed, and any comment or argument will not be considered evidence. The city commission shall issue a final decision in the form of a resolution or ordinance which shall include: findings of fact and listings of any conditions, requirements or limitations on the approval.

E. *Continuances.* A hearing may be continued to a specified date, time and place. The city clerk shall cause notice to be given to all persons originally entitled to notice, of the date, time and place of such continued hearing in the same manner as specified in section 4-206(C).

F. *Application amendments.* If an application is amended to a less intensive request, such application may continue to proceed through the development review process. If an application is amended to a more intensive request, such application shall be readvertised to all persons originally entitled to notice and shall include the date, time and place of such hearing in the same manner as specified in section 4-206(C) and reheard in accordance with the procedures specified in section 4-206(D).

G. *Record of hearing.* The city clerk shall ensure that the proceedings are recorded by appropriate means. If a sound recording is made, any person shall be entitled to listen to the recording at any reasonable time or to make copies at his own expense. The record shall consist of the recording of testimony, all applications, exhibits and papers submitted in any proceeding with respect to the matter being considered, the report and recommendation of the community development coordinator, the Comprehensive Plan, and this Development Code.

H. *Reconsideration or rehearing.* After a final decision, reconsideration or rehearing may be granted only upon a determination by the community development board or the hearing officer, as the case may be, at the next regularly scheduled meeting of the community development board or within ten days of a hearing officer's that the decision, was based upon mistake, fraud or misrepresentation. If reconsideration or rehearing is granted, notice shall be provided in the same manner as the original proceeding.

I. *Other rules.* Any other matters pertaining to the public hearing shall be governed by the provisions of this Development Code applicable to the community development board and city commission and their adopted rules of procedure.

J. *Absence of applicant at hearing.* If neither the applicant nor the applicant's representative is present at a public hearing, the community development board, the city commission or a hearing officer, may continue consideration of the matter upon the timely receipt of a request to continue the matter because of exigent circumstances which preclude the attendance of an applicant or his or her representative which request is received by the decision maker prior to the noticed time of consideration of the matter, or shall deny the application unless such application involves the annexation of property developed or to be developed with one detached dwelling, property which is the subject of an approved annexation agreement or unless the application for development approval constitutes competent substantial evidence in support of the application.

(Ord. No. 6526-00, § 1, 6-15-00)

# PERMITTED USES: LEVEL ONE

(Ord. No. 6526-00, § 1, 6-15-00)

B. *Other revisions.* Any other adjustments or changes not specified as "minor" shall be granted only in accordance with the procedures for original approval.

### Section 4-407. Expiration of approval.

Unless otherwise specified in the approval, an application for a building permit shall be made within one year of the date of the level two approval, and all required certificates of occupancy shall be obtained within one year of the date of issuance of the initial building permit. Permitted time frames do not change with successive owners and an extension of time may be granted by the community development board for a period not to exceed one year and only within the original period of validity. Transfer of development rights are exempt from this provision. (Ord. No. 6526-00, § 1, 6-15-00)

### DIVISION 5. APPEALS

### Section 4-501. Authority and purpose.

A. The community development board has the authority to hear appeals from:

1. Administrative interpretations of this development code.

2. Orders, requirements, decisions or determinations made by an administrative official in the administration of this development code, except for enforcement actions.

3. Level one approval decisions.

4. Denials of any permit or license issued *under the provisions of this Code.*

B. The hearing officer has the authority to hear appeals from:

1. Decisions of the community development board regarding level two approvals.

2. Decisions of the community development board regarding level one approvals.

3. [Reserved.]
(Ord. No. 6526-00, § 1, 6-15-00)

### Section 4-502. Application/notice of appeal.

A. An appeal of a level one approval (flexible standard) may be initiated by a property owner abutting the property which is the subject of the approval within seven days of the date the development order is issued. The filing of an application/notice of appeal shall stay the effect of the decision pending the final determination of the case.

B. An application/notice of appeal of any decision of the city, as provided in section 4-501, may be initiated by the applicant or any person granted party status within 14 days of the decision. Such application shall be filed with the city clerk in a form specified by the community development coordinator identifying with specificity the basis for the appeal and accompanied by a fee as required by section 4-202(E). The filing of an application/notice of appeal shall stay the effect of the decision pending the final determination of the case.

C. No building permit shall be issued for a Level Two or Level Three approval prior to the expiration of the appeal period.
(Ord. No. 6526-00, § 1, 6-15-00)

### Section 4-503. Staff review, report and recommendation.

After the community development coordinator has reviewed the application/ notice of appeal in accordance with the provisions of section 4-202(C) and (D), the coordinator shall send a written recommendation to the community development board, or the hearing officer, if applicable, with a copy to the applicant, setting forth whether the appeal should be granted or denied and the grounds for such recommendation.
(Ord. No. 6526-00, § 1, 6-15-00)

### Section 4-504. Community development board appeals.

A. Except as provided in subsection B of this section, upon receipt of the recommendation of the community development coordinator regarding appeals from decisions set out in section 4-501(A), the community development board shall review the application, the recommendation of the community development coordinator, conduct

§ 4-504 COMMUNITY DEVELOPMENT CODE

a quasi-judicial public hearing on the application in accordance with the requirements of section 4-206 and render a decision in accordance with the provisions of section 4-206(D5) granting the appeal, granting the appeal subject to specified conditions or denying the appeal.

B. Upon receipt of an application/notice of appeal from a level one approval (flexible standard) from an abutting property owner, the community development board shall place the appeal on the consent agenda of the next scheduled meeting of the board. Notice of the date of such meeting shall be provided the applicant and the appellant(s) by mail and by telephone. The appeal may be removed from the consent agenda only by a vote of at least four members of the community development board. If the appeal is not removed from the consent agenda, it shall be approved, along with any other consent agenda items, by a vote of a majority of the members of the board. If the appeal is removed from the consent agenda, the community development board shall review the application, the recommendation of the community development coordinator, conduct a quasi-judicial public hearing on the application in accordance with the requirements of section 4-206 and render a decision in accordance with the provisions of section 4-206(D)(5) granting the appeal, granting the appeal subject to specified conditions or denying the appeal.

C. In order to grant an appeal, overturning or modifying the decision appealed from, the community development board shall find that based on substantial competent evidence presented by the applicant or other party:

1. The decision appealed from misconstrued or incorrectly interpreted the provisions of this development code;

2. That the decision will be in harmony with the general intent and purpose of this development code; and

3. Will not be detrimental to the public health, safety and general welfare.

### Section 4-505. Hearing officer appeals.

A. Upon receipt of a notice of appeal regarding decisions set out in Section 4-501(B), the hearing officer shall, in concert with the city clerk, establish a timely date and hour and location for a quasi-judicial hearing. The city clerk shall give notice of the public hearing in accordance with the provisions of section 4-206(C) and the hearing shall be conducted in accordance with the procedures set forth in section 4-206(D).

B. The record before the community development board shall be incorporated into the record before the hearing officer, supplemented by such additional evidence as may be brought forward during the hearing.

C. The burden shall be upon the appellant to show that the decision of the community development board cannot be sustained by the evidence before the board and before the hearing officer, or that the decision of the board departs from the essential requirements of law.

D. The hearing officer shall render a decision within 45 days of the hearing in accordance with the provisions of section 4-206 (D5). The decision of the hearing officer shall be final, subject to judicial review by common law certiorari to the circuit court. The filing of a petition for certiorari stays the decision of the hearing officer pending the final determination of the case.

G. A certificate of concurrency/capacity shall expire if the underlying development order expires or is revoked by the city and the capacity has not been extended to a subsequent development approval for the same parcel.

H. A denial of a certificate of concurrency/ capacity may be appealed in the manner provided in Article 4, Division 5.

### Section 4-903. Standards for certificate of concurrency/capacity.

A. In determining whether a certificate of concurrency/capacity may be issued, the community development coordinator shall apply the level of service standards in the comprehensive plan according to the following measures for each public facility:

1. Potable water: water service area.

2. Sanitary sewer: sewer facility availability.

3. Drainage: drainage basin.

4. Solid waste: citywide.

5. Parks and recreation: citywide.

6. Roads: Section 4-803(C) Standards for Traffic Impact Study.

B. For public facilities provided by entities other than the city, the certificate may be issued subject to the availability of such public facilities consistent with policy 28. 3. 3 of the comprehensive plan.

C. If the capacity of available public facilities is less than the capacity required to maintain the level of service standard for the impact of the development, the applicant may:

1. Accept a 15-day encumbrance of public facilities that are available and, within the same 15-day period, amend the application to reduce the needed public facilities to the capacity that is available.

2. Accept a 90-day encumbrance of public facilities that are available and, within the same 90 day period, arrange to provide for public facilities that are not otherwise available.

3. Reapply for a certificate of capacity not less than six months following the denial of an application for a certificate of capacity.

D. If the capacity of impacted roads is inadequate, the community development coordinator may consider the following forms of mitigation:

1. System improvements, including but not limited to turn lanes, signals, acceleration/ deceleration lanes and intersection improvements.

2. Travel time/speed studies conducted using methodology and data acceptable to the community development coordinator.

3. Alternative transportation programs, incentives and disincentives, including but not limited to transit systems, car pools, van pools, limited parking, and staggered work hours.

4. The following are not generally acceptable mitigation strategies:

 a. Improvements to roads that are not below level of service standards.

 b. Diverted trips.

 c. Averaging, i.e., system analysis instead of by link.

### DIVISION 10. SIGN PERMIT

### Section 4-1001. Purpose.

It is the purpose of this division to establish procedures for the review and approval of signs in accordance with the standards of Article 3, Division 18.

### Section 4-1002. Permit required.

No sign shall be located, placed, erected, constructed, altered or extended without first obtaining a sign permit, except for signs listed in section 3-1805.

### Section 4-1003. Application.

In addition to the basic information required by section 4-202(A), where applicable, and the fee required by section 4-202(E), an application for

approval of a sign shall be treated as a level one approval in accordance with the provision of Article 4, Division 3 and shall be accompanied by plans and specifications, drawn to scale and including the following:

A. Legal description of the property where the sign is proposed to be located;

B. Name, address and telephone number of the owner of the property where the sign is proposed to be located;

C. Name, address and telephone number of the lessor of the property or building upon which the sign is proposed to be located, if applicable, and a notarized statement of authorization signed by the lessor consenting to the sign placement and a copy of the executed lease;

D. Name, address and telephone number of the sign erector;

E. Type of sign proposed;

F. Surface area of the sign proposed;

G. Value of sign proposed;

H. Location of the sign in relation to property lines, public rights-of-way, easements, buildings and other signs on the property;

I. Dimensions and elevations, including the message of the sign;

J. Lot frontage on all street rights-of-way;

K. Maximum and minimum height of the sign;

L. Dimensions of the sign's supporting structures;

M. For illuminated signs, the type, placement, intensity and hours of illumination;

N. Construction and electrical specifications, to allow a determination that the sign meets all applicable structural and electrical requirements of the building code;

O. Number, type, location and surface area of all existing signs on the same property and or building on which the sign is to be located.

### Section 4-1004. Procedures.

An application for approval of a sign shall be reviewed and approved by the community development coordinator as a level one approval in accordance with the procedures in Article 4 Division 3. Upon approval of the sign as being in conformity with this development code, the coordinator shall forward the application to the building official who shall determine if the application complies with the provisions of the building code. Upon determining that an application conforms to the building code, a building permit shall be issued.

### Section 4-1005. Expiration.

Sign permits shall be valid for a maximum of 180 days after issuance. Failure to place the sign within the allotted time period shall void the permit and necessitate reapplication.

### Section 4-1006. Identification.

All signs requiring a permit shall have the permit number permanently marked on the sign in a visible location.

### Section 4-1007. Inspections.

The community development coordinator and the building official shall, as each may determine necessary, inspect the property to ascertain that the sign is in accord with all provisions of the development code and the building code and in accord with all terms upon which the sign permit may have been conditioned.

### DIVISION 11. LANDSCAPING PLAN

### Section 4-1101. Landscaping required.

Landscaping shall be required in accordance with the provisions of Article 3 Division 12 for the following development:

A. Any landscaped area serving a new use or a change of use.

B. If an existing use is improved or remodeled in a value of 25 percent or more of the valuation of the principal structure as reflected on the property appraiser's cur-